United States Court of Appeals,

Eleventh Circuit.

No. 95-3004.

UNITED STATES of America, Plaintiff-Appellee,

v.

Norbert SCHLEI, B.J. Bravender Ah Loo, Defendants-Appellants.

Sept. 18, 1997.

Appeal from the United States District Court for the Middle District of Florida. (No. 92-49-CR-T-17C), Elizabeth A. Kovachevich, Judge.

Before BLACK, Circuit Judge, and FAY and ALARCÓN[*], Senior Circuit Judges.

ALARCÓN, Senior Circuit Judge:

Barbara Jean Bravender Ah Loo ("Ah Loo") and Norbert Schlei have appealed from the judgments of conviction.[1] Schlei also seeks review of the district court's sentencing decision. Schlei was convicted of conspiracy and securities fraud. Schlei seeks reversal on numerous grounds, each of which we address below.

We vacate the order denying Schlei a new trial and an evidentiary hearing with directions that the district court make express findings regarding the alleged witness intimidation claim. We vacate the judgment of conviction on Count Ten because we conclude that the district court erred in denying Schlei's motion to strike duplicitous allegations regarding a separate crime in a different venue. We affirm the district court's order on the balance of Schlei's contentions.

The transactions that preceded the indictment in this case are unusual, if not bizarre. Most of the evidence was undisputed.

---

[*]Honorable Arthur L. Alarcon, Senior U.S. Circuit Judge for the Ninth Circuit, sitting by designation.

[1]The court has been notified that Ah Loo expired on July 24, 1997. Accordingly, by separate order, we have dismissed her appeal as moot. *United States v. Logal,* 106 F.3d 1547, 1551-52 (11th Cir.1997). Schlei adopted the arguments presented by Ah Loo. Schlei lacks standing to assert Ah Loo's outrageous government conduct claim because he was not the target of the sting operation. *United States v. Bogart,* 783 F.2d 1428, 1433 (9th Cir.1986). Therefore, we do not reach that issue. To the extent that the remaining contentions relate to Schlei, we will consider them as if he had presented these arguments in his own briefs.

The prosecution presented evidence that Schlei, and others attempted to sell certain financial instruments in the United States. Schlei and his salespersons represented that these financial instruments had been issued by the government of Japan or the Dai-Ichi Kangyo Bank. The instruments were labeled "Certificates of Balance of Redemption, Series 57" (the "bond certificates"), with face amounts ranging from ten billion yen to 500 billion yen, and cashier's checks allegedly issued by the Dai-Ichi Kangyo Bank (the "bank notes"), each drawn for fifty billion yen. The bond certificates were purportedly issued by the government of Japan in exchange for money or property received from the bond certificate holders or payees.

The prosecution's theory at trial was that Schlei had actual knowledge, or deliberately closed his eyes, to the fact that these financial instruments were worthless because they were not issued by the government of Japan or the Dai-Ichi Kangyo Bank. Schlei testified that he believed that the instruments were valid but that corrupt officials of the government of Japan had falsely claimed that they were not genuine. The jury was persuaded beyond a reasonable doubt that the bond certificates and bank notes were not genuine and that Schlei had the requisite criminal intent to defraud when he represented to prospective purchasers that these instruments were valid.

I

SUFFICIENCY OF THE EVIDENCE

A. *Background*

Schlei argues that the judgment must be reversed because the Government failed to present evidence that he intended to defraud anyone in attempting to sell the bond certificates and the bank notes. He asserts that the record shows that he informed each prospective buyer that the government of Japan claimed that these financial instruments were not valid. He also maintains that fraud has not been demonstrated because no reasonable person would have purchased these instruments without receiving confirmation of their validity from the Japanese government, in view of their

2

extraordinary face value and the disclosures made to prospective purchasers.[2]  In addition, Schlei contends that the evidence is also insufficient to demonstrate that he directly or indirectly participated in the sale of a bond certificate to undercover officers in Tampa, Florida.

In discussing whether the evidence is sufficient to sustain the judgment of conviction against Schlei, we are required to review the facts produced at trial by the parties in the light most favorable to the Government.  *United States v. Calhoon,* 97 F.3d 518, 523-24 (11th Cir.1996), *petition for cert. filed,* 65 U.S.L.W. 3694 (U.S. Mar. 31, 1997) (No. 96-1557).  In reviewing a sufficiency claim, we "accept[ ] all reasonable inferences and credibility choices made in the government's favor, to determine whether a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt."  *Id.* at 523.  "We also review *de novo* whether there was sufficient evidence to support the convictions."  *Id.*

1. *The Source of the Financial Instruments*

In the early part of 1985, Sam M. Han, a Korean-American, met with C.K. Lee, a fellow Korean-American, and T. Hiraki, a Japanese national, in Los Angeles, California.  Lee and Hiraki told Han that they represented certain persons who wanted Han's assistance in getting the government of Japan to acknowledge the validity of the bond certificates and bank notes.  Han was told by Hiraki and Lee that the government of Japan claimed that the financial instruments were not genuine and had refused to honor them.  Han urged Lee and Hiraki to seek legal advice.

In March of 1985, Han and Lee met with Schlei at his law office in Los Angeles to discuss negotiation of the financial instruments.  Han and Lee informed Schlei that the government of Japan would not negotiate with them without pressure from outside of Japan.  Sometime shortly thereafter, Schlei met with Han and Lee, as well as a group of Japanese nationals, including Toshio Takahashi. Schlei, Han, and Takahashi later traveled to Japan and interviewed persons who possessed some of

---

[2]According to the parties, the United States currency equivalent for the bond certificates ranged from one hundred million dollars for a ten billion yen bond certificate, to five billion dollars for a five hundred billion yen bond certificate.  The fifty billion yen bank notes were equivalent to five hundred million dollars.

the bond certificates and bank notes. The holders of these instruments informed Schlei and Han that they received them from a woman named Hatsu Aoyagi.

On April 8, 1985, Schlei and Han met with Stanley Sporkin, the general counsel for the Central Intelligence Agency ("CIA"). At this meeting, Schlei told Sporkin that he had been informed by a group of Japanese citizens that a secret, two billion dollar fund had been accumulated by General Douglas MacArthur during the American occupation of Japan. Schlei stated the secret fund came from money confiscated from foreigners, the imperial family, and property seized during Japan's occupation of Korea. Schlei's alleged informants referred to it as the Marquat Fund (the "M Fund"). Schlei told Sporkin that the fund was administered by the United States and the Liberal Democratic Party in Japan. Schlei related that he was informed that in 1958, then-Vice President Nixon promised to give Okinawa to Japan and turn control of the M Fund over to Japan in exchange for Japan's support in electing him president of the United States. Schlei told Sporkin that a woman who had been indicted for the forgery of these financial instruments had been acquitted of that charge.

Sporkin testified that Schlei declared that he wanted the CIA to know he was going to try to present these instruments for payment and "wanted to give [him] a heads up to a possible political problem." Sporkin informed Schlei that he knew nothing about the financial instruments or the M Fund, and that the story Schlei had related "seem[ed] extraordinary." Sporkin also testified that he thought "it was a crazy idea, preposterous."

Sporkin promised Schlei that he would call him to indicate whether the CIA had any interest in Schlei's plan to attempt to sell the bond certificates and the bank notes. In a subsequent telephone call, Sporkin told Schlei that the CIA had no interest in the proposed sale of the financial instruments because "[i]t was a private matter."

4

After returning to Los Angeles, Schlei agreed to provide legal representation to Hiraki, Takahashi, Lee, and Han "in relation to the negotiation and cashing of certain checks and other instruments."[3]

---

[3]The undated written retainer agreement reads as follows:

AGREEMENT

The undersigned parties agree as follows:

Norbert A. Schlei agrees to provide such legal services as may be required in relation to the negotiation and cashing of certain checks and other instruments with respect to which his assistance is sought, including but not limited to checks numbered A35261, A35262, A35263, A35264, A35265 and A35266 drawn on the Dai-[I]chi Kangyo Bank, Inc.

? T. Hiraki and T. Takahashi, acting on their own behalf and on behalf of Sadao Niwa and other owners of the documents to which this agreement relates, and C.K. Lee and S.M. Han, acting on their own behalf, agree that the fee to be paid for such legal services shall be a contingent fee of 5% of the amount recovered on such checks or other instruments;  provided, however, that T. Hiraki and T. Takahashi shall have the option, for thirty days after the date hereof, to reduce the contingent fee (a) by 1% (to 4%) by paying a retainer fee of $50,000 in cash, or (b) by 2% (to 3%) by paying a retainer fee of $100,000 in cash.

Wherefore the undersigned have duly executed this agreement.

Dated:_____

/s//s/

 Norbert A. SchleiT. Hiraki

/s/

T. Takahashi

/s/

C.K. Lee

/s/

S.M. Han

5

In May of 1985, Schlei and Lee tried to negotiate one of the bank notes at the Dai-Ichi Kangyo Bank in Japan. The bank notified Schlei that it would not honor the bank note because it was a forgery.

In furtherance of the plan to sell the bond certificates and bank notes, Schlei filed the articles of incorporation of the Japan-America Foundation, Inc. ("Foundation") in Panama on January 6, 1986. Schlei was designated as a member of the board of the Foundation as well as its secretary and treasurer. Takahashi was named as the chairman of the board and chief executive officer. Han was designated as the president of the Foundation. Pursuant to the articles of incorporation, the Foundation was formed to arrange the assignment of the bond certificates and bank notes from the nominees or payees, and to invest the proceeds of any sale "to benefit the peoples of Japan and the United States or secondarily the peoples of the nations of the Pacific Basin and the world."

Lee, Michael Dow, and Jesse Levine were indicted on January 31, 1986, in the District of Nevada for attempting to sell some of the bond certificates. Upon being informed of the arrest of Lee, Dow, and Levine, Schlei went to Nevada to help them. Schlei also wrote a letter to the United States Attorney for the District of Nevada, demanding the return of the bond certificates and bank notes to the Foundation as the owner of the instruments.

On February 17, 1986, approximately three weeks after Lee was indicted for attempting to sell forged bond certificates, Schlei met with United States Ambassador Mike Mansfield at the United States embassy in Tokyo, Japan. Also present were Daniel Russel, the Ambassador's executive assistant, and John Weeks, the embassy's assistant financial attaché. At this meeting, Schlei related the alleged genesis of the bond certificates and the bank notes, as related to him by his clients.

Russel testified at trial. He summarized Schlei's narration as follows:

Well, he recounted a very elaborate tale of conspiracy involving some hidden Japanese war treasures that includes the systematic connivance of such figures as General Douglas MacArthur and the first prime minister of Japan as well as the complete pantheon of senior Japanese officials then in the Government, as I recall, including—up to and including the prime minister of Japan in some elaborate cover-up exploitation scheme.

6

At his meeting with Ambassador Mansfield, Schlei did not present any documents or other evidence to corroborate his account of the source of the financial instruments. Schlei also failed to advise Ambassador Mansfield that Lee had been recently indicted for attempting to sell forged bond certificates.

Russel testified that his position as executive assistant to the Ambassador required him to be informed regarding Japanese politics. Russel testified that he found "it totally unbelievable that such a conspiracy could have been in progress for decades without becoming widely known," because "it involved such a massive conspiracy that would have entailed the connivance of virtually every senior politician in Japan."

The day following his meeting in the United States embassy, Schlei drafted a letter to Ambassador Mansfield in which Schlei related in greater detail his clients' representations regarding the source of the bond certificates and bank notes. Schlei's message was typed on the letterhead of the United States embassy in Japan in two separate formats. One statement, received as Exhibit 17 at trial, contained the following words in the first paragraph:

> The following is the retyped text of a letter received from Norbert Schlei summarizing the information provided by him at the meeting referred to above:

> Dear Ambassador Mansfield:

Exhibit 17 ended with the words "Sincerely, Norbert A. Schlei." The other statement, received into evidence as Exhibit 21, did not contain the above-quoted language.[4] Otherwise, the

---

[4]Exhibit 21 reads as follows:

February 21, 1986

*MEMORANDUM OF MEETING*

*In Attendance:*

Ambassador Mansfield

Danny Russel, AEX

John L. Weeks, Assistant Financial Attache

Norbert A. Schlei

*Subject:* Letter to Ambassador Mansfield from Norbert A. Schlei: Subject Matter of his visit to Japan its historical value

*Meeting Held:* February 17, 1986, at 10:00 a.m.

Thank you for your courtesy in seeing me yesterday despite the fact that it was a holiday. Pursuant to the request made by your colleagues after our meeting, I am writing this memorandum to provide in more usable form the information I gave you at our meeting.

As I told you at our meeting, I have come to Japan nominally representing only a newly-formed non-profit corporation, Japan-America[ ] Foundation, Inc. However, in substance I represent approximately 80 Japanese individuals, active in the Liberal Democratic Party, who are seeking to gain control of what they consider to be their share of a very large, confidential, quasi-governmental fund which has been administered for decades by the leadership of the Liberal Democratic Party.

The fund is represented by checks, bonds and other instruments issued by the Bank of Japan, the Ministry of Finance and the leading private banks of Japan. My Japanese clients are the holders of a large number of these instruments which they have been prevented from cashing by government opposition. They have sought help ouside [sic] Japan in the belief that this would force the issue and induce the government to deal with their claims. That indeed has been the result, and it is for the purpose of participating in the negotiations now taking place that I have come to Japan. It remains to be seen whether I will be able to participate directly in these negotiations or will simply act as adviser to our side's Japanese representatives.

The present negotiations arose out of our group's arranging late last year for the presentation to the Dai-Ichi Kangyo Bank of a cashier's check for Yen 50 billion (then about $200 million). The check was presented by Prudential Bache Securities through the Morgan Guaranty Bank. When the check arrived in Japan it precipitated great agitation and conferences about what to do; meanwhile, the check sat at the Bank for 35 days without eliciting a response. Finally, the Bank rejected the check and sent it back, but a solution then began to take shape.

As a result of the presentation of the Dai-Ichi check a confidential committee was formed under Mr. Fujinami, then the Secretary of the Cabinet, to consider how to resolve the matter. Members of the Committee included a Mr. Kubota, head of a bureau of the Ministry of Finance, and a Mr. Taniguichi, an intelligence official, among others whose identity I do not know. The Committee recommended that the outstanding checks and other instruments be compromised by paying 5% of the outstanding amount (i.e., approximately yen 7 trillion or $35 billion) provided that adequate assurance could be secured that the funds would indeed be used for constructive purposes in Japan's interests, and not deverted [sic] to personal uses. The Minister of Finance, Mr. Takeshita, approved the Committee's recommendation and began accumulating and segregating the funds required to effect the settlement.

Our group was in contact with the Committee and as a result of discussions in

8

early December asked me to form the Japan-American Foundation, Inc., to be the recipient of the proceeds of the settlement. The Foundation will be governed by up to 36 trustees, half of which must be Americans and half Japanese, and will distribute its income annually to good causes in Japan, the United States and Pacific Rim countries.

Later in December Mr. Fujinami was replaced by Mr. Masaharu Gotoda. Mr. Gotoda took a less favorable view of the proposed settlement and the negotiations slowed to a stop. However, they have recently resumed their progress and last week the government made an offer to our group of 3% of face value; this would involve a total payment of about yen 4 trillion or some $20 million.

*The Background*

As I did in our meeting, I will set forth the background as I understand it from my clients. I may have it garbled in some respects but I am confident that in essence it is correct.

The fund for which my clients are contending had its origin in the immediate postwar era. At that time General MacArthur became convinced that it was essential to establish a secret fund to be used for various purposes not suitable for public view. Among these purposes was the financing of political activity deemed necessary to give democratic forces a running start and keep leftists in check until the new system was operating properly.

Such a fund was duly created, utilizing primarily money and treasures which had been brought to Japan during the war from occupied areas (China, Korea, Taiwan, The Philippines, etc.) and funds and properties which had been owned by Japanese military forces. So-called counterpart funds were later added. These funds were administered by General MacArthur's Headquarters with the active assistance and advice of Prime Minister Yoshida.

The fund established by MacArthur is sometimes called the "M Fund" or "Marcut [sic] Fund" after an officer named Marcut [sic] who was identified with the fund's establishment and early operation. The fund was used not only for political purposes but for governmental or quasi-governmental purposes, such as providing very low-interest loans to Japanese key industries including coal, fertilizer, iron, shipbuilding, power and other heavy industries.

When the Korean War broke out in 1950, General MacArthur required Japan to establish a National Police Reserve for the purpose of filling the vacuum in the maintenance of public order left upon the departure of the occupation army for Korea. The Police Reserve was the predecessor of today's National Defense Force. About yen 20 million needed to establish the Police Reserve was allocated from the M Fund.

After the US-Japan Security Pact came into effect the fund continued to be jointly administered by the U.S. and Japan until the terms of the Pact were revised in the late 1950's through negotiations between Vice President Nixon and Prime Minister Nobusuke Kishi. My clients assert that Nixon agreed with Kishi that if Japan would assist him in becoming President, he would see to it that the U.S. withdrew from its role in managing the M Fund and upon being elected would return Okinawa to Japan. The revision of the

9

Security Pact accomplished the former and in 1972 Mr. Nixon did the latter.

My clients also assert that in due course Mr. Kishi helped himself to a fortune of yen 1 trillion from the fund.

According to my clients a condition of the release of Japan of the M Fund was that Japan add a specified amount to the yen 12.3 trillion of which it consisted at that time. The task of adding the required amount to the Fund fell to the administration of Premier Hayato Ikeda, who succeeded Kishi. The plan was to obtain the necessary amount by selling the Japanese real estate which the government had confiscated during the war from people of enemy countries. The task of carrying out this plan was delegated to Kakuei Tanaka, Finance Minister in the Ikeda Cabinet.

Tanaka started the work in 1960 with financial assistance from Kenji Osano, Hideki Yokoi (and, later, a number of my clients) and such companies as Nissho Iwai, Nishikawa Futon and Konishi Sake Brewery. A total of 1,681 properties were sold at a total profit of yen 7.9 trillion. Most of these funds were deposited in the Nippon Kogyo Bank because Soppei Nakayama, President of the Bank, had greatly assisted Tanaka's work. Fund sales were halted by Premier Sato in 1970 in order to avoid public disclosure of the program after questions were raised in a Diet committee by Akira Kuroyanagi Diet member from Komeito.

During the years of Japanese administration of the Fund, it was normally held in the form of negotiable documents in the name of the Prime Minister or a small number of key officials. However, when the Lockheed scandal threatened to erupt in the 1970's and it was thought necessary to have the documents held in others' names, a different policy was adopted and a large number of holders were utilized. At the present time about 80 individuals hold documents representing a portion of the Fund.

When the individuals holding the documents representing the Fund began to demand a voice in administering the Fund, the government vigorously resisted. At various times it forcefully demanded return of the documents, but very few holders responded. In order to prevent these documents from being negotiated, the government has at times advised persons making inquiry about these documents that they are forged. However, my clients assert that most of the documents presently ots presently outstanding can be shown to have been printed at a factory of the Finance Ministry in 1981 by order of Finance Minister Michio Watanabe, now Minister of International Trade and Industry. The ink used for the printing, they assert, is the ink used for printing the old paper money, now no longer circulating, and is totally unavailable except to the Ministry of Finance.

The face value of instruments now outstanding probably exceeds by a considerable margin the amount of money actually in the Fund. This results partly from the activities of a woman named Hatsu Aoyagi, who worked closely with Tanaka and had a role in selecting the holders of the securities representing the Fund. Ms. Aoyagi was convicted of fraud and misappropriation of funds within the past year in a Tokyo court. One thing she apparently did was to charge people large sums to become holders of the Fund's securities. She represented that the fees charged would go to the Party, but in fact she pocketed most of them. Also, although in some instances she was supposed to exchange one set of securities for another, in some instances she simply distributed the

10

text of each statement was identical.

---

new ones without collecting the old.  Because of this practice and perhaps other irregularities, the face value of the instruments outstanding is approximately yen 130 trillion whereas the actual amount of the Fund is believed to be a maximum of approximately yen 50 trillion.

My clients assert that one of the reasons for their determination to bring this matter to a head is that the Fund has been productive of impropriety and corruption.  In addition to Mr. Kishi, they say that Mr. Tanaka misappropriated a large fortune of yen 10 trillion which is invested through the Swiss Union Bank. They state that Mrs. Hiroko Sato, widow of premier Eisaku Sato, cashed documents amounting to yen 300 billion through the Case Bank. According to my clients Mr. Masaharu Gotoda, Secretary of the Cabinet who has somewhat impeded their settlement, has personally cashed three checks through the Dai-Ichi Kangyo Bank for a total sum of yen 60 billion.  It is, of course, possible that some of these sums were further transferred and applied to proper purposes.

With a view to testing the reliability of some of the assertions made by my clients I asked how it was known that Mr. Gotado had obtained yen 60 billion from the Dai-Ichi Kangyo Bank. The reply was that a member of our group is an official of a government agency which was engaged at the time in a special investigation;  that when Mr. Gotoda conducted his final negotiation with a high official of the Bank, he did so on a telephone line that happened to be tapped;  that the Bank asked Mr. Gotoda to accept yen 50 billion but he adamantly refused, after which arrangements were made on the telephone to pay him the full amount demanded.

I believe that the negotiations relating to this matter will be concluded in any and all events by the end of the Japanese government's fiscal year on March 31.  If the non-profit foundation we have formed is indeed founded, it will have an enormous potential for good.  Two people—Senator Alan Cranston and Jack Anderson, the syndicated columnist—have been asked by people in our group to serve as trustees and have agreed to do so.  I plan to ask Ted Kennedy to join us.  You would be an ideal trustee if your post would permit such service.

As you know, I am providing this information on the understanding that it will be kept confidential in the sense of not being disclosed to the public, and will not be attributed to me.  Any use of this information you may feel is in the interests of the United States in terms of disclosure within the government is not objectionable to me or my clients.

I will keep you informed.

Again thanks, and kindest personal regards.

cc:  Desaix Anderson, DCM

Bill Breer, POL

Danny Russel, AEX

11

Russel testified that memoranda typed on the letterhead of an embassy of the United States could only be used for official business. Foreign Service employees are forbidden from using embassy letterhead for personal reasons.

During the search of Roger A. Hill's safety deposit box at the Embassy Suites Hotel in Tampa, on January 18, 1992, the officers found a copy of Exhibit 21. Hill testified that he used the memorandum typed on embassy letterhead in attempting to sell the bonds because he believed it showed that "the United States was supporting Mr. Schlei."

On February 18, 1986, Schlei met with Mr. Kubono of the Ministry of Finance in Tokyo. During this meeting, Schlei delivered the following letter to Kubono:

> Thank you for your courtesy in receiving me today. Unfortunately, I believe our meeting can only be preliminary in nature since I am certain that resolution of my business in Japan will require meetings at the highest level in the Ministry.
>
> On the telephone when this meeting was being arranged, you stated that you could only repeat the assertion of the Dai-Ichi Kangyo Bank that the checks held by my clients were not issued by the Bank. Please be advised that our clients are prepared to prove that these checks were issued by the Bank and will do so in court if it is necessary.
>
> In addition to the checks, our clients hold numerous bonds and other instruments which were issued by the Ministry of Finance. Although it has been asserted by some lower-level officials that these documents are not genuine, we can prove that they were printed in a factory of the Ministry of Finance in 1982 by order of then-Finance Minister Michio Watanabe, and that they are duly and properly issued....
>
> ....
>
> As is known at a higher level in the Ministry, these instruments represent a fund which had its origin in the so-called M Fund and which has been kept secret for forty years.

On February 28, 1986, Schlei dispatched a letter to the Minister of Finance, Noboru Takeshita, containing the following words:

> Although I have been in Tokyo since February 17, I have not been able to see you. Your office referred me first to a Mr. Kubono, who saw me briefly and informed me that he was the wrong person for me to see. A copy of the letter I delivered to Mr. Kubono at the time of our meeting is attached for your information.
>
> After seeing Mr. Kubono I was referred to a Mr. Koguchi, who informed my representative on the telephone that there was no point in any further interviews since the checks, Japanese national bonds and other instruments which are the subject matter of my visit to Japan are not genuine. (Neither Mr. Kubono nor Mr. Koguchi examined any of these instruments before informing me that they were invalid.)

12

....

I urge you to have a representative contact me so that this matter can be discussed frankly and confidentially. I suggest to you that delay will inevitably be harmful.

On March 26, 1986, Kazuhiko Koguchi responded to Schlei's letter on behalf of the office of the vice minister for international affairs of the Ministry of Finance. Koguchi's letter reads as follows:

I am writing to respond to your letter dated February 28, 1986, addressed to Finance Minister Takeshita, since you referred to my name in it.

During your visit to Tokyo, I was telephoned by three different persons, who respectively introduced themselves as Mr. Yamada, Mr. Tanabe, and Mr. Nagao but would not identify themselves further. I told Mr. Nagao that the Japanese national bonds that you have might not be genuine, since he told me that they bear the name "Kokusai Kanpukin Zandaka Kakuninsho", and there were in the past counterfeit bonds bearing exactly the same name (the Ministry of Finance has never issued such bonds). Then I advised him to contact the Government Debt Division of the Financial Bureau to have them examine the validity of the bonds.

Therefore, it is regrettable that you did not contact that division while you were in Tokyo. Once again I advise you to examine the validity of the bonds.

On July 26, 1988, depositions were taken in the United States embassy in Japan in connection with the prosecution of Lee and his codefendants for attempting to sell the forged bond certificates in Nevada. A judge of the United States District Court for the District of Nevada authorized Schlei to be present at these deposition proceedings as a consultant to the attorneys for Lee, Dow, and Levine, over the objection of Assistant United States Attorney ("AUSA") Thomas R. Green.

On July 28, 1988, the parties to the criminal prosecution in the District of Nevada deposed Aoyagi at the Tochigi Prison in Japan. Aoyagi had previously been sentenced to prison for participating in a scheme to counterfeit and distribute the bond certificates and bank notes. She testified that she sold these instruments in Japan. She identified the bond certificates and bank notes taken from Lee and his codefendants as part of the group that had been forged.

13

When the deposition of Aoyagi was completed, AUSA Green, made the following comment to Stephen Stein, Levine's attorney: "[O]kay, you have to admit now that these are forgeries, don't you?" Stein replied:

> Tom, you got me, I am convinced they're not real, they couldn't be real. This woman is so credible that I'm convinced. You've got me. These are not real Bonds. No one could believe they are real Bonds.

Schlei was standing next to Stein when this exchange took place. Stein turned to Schlei and said "What do you think?" Schlei replied: "I agree. They can't be real after listening to this."

At trial, AUSA Green testified that Lee pled *nolo contendere* in the District of Nevada to a charge arising out of his arrest for attempting to sell the bond certificate.

2. *Attempted Sale of the Financial Instruments Prior to the Sting Operation*

a. *Roger A. Hill's Role in Attempting to Negotiate the Financial Instruments*

David Lazar, a longtime friend of Han, introduced Hill to Han, who in turn introduced Hill to Schlei. On April 24, 1986, approximately three months after Lee was indicted in the District of Nevada for attempting to sell forged bond certificates, Schlei wrote Hill regarding their ongoing negotiations for Hill to purchase some bond certificates and bank notes from the Foundation. The letter provided, in part:

> It is the purpose of this letter to make it possible for our client to establish that it has made full disclosure of the problems that exist with respect to these instruments, and that your purchase is not based on any material misrepresentation or non-disclosure of material facts.

> The payees of the instruments here involved, who transferred them to the Foundation, have informed the Foundation that they believe the instruments were in fact issued by the institutions by whom they purport to have been issued, and that the instruments represent a confidential fund of money (the so-called M-Fund) which has been administered by the Liberal Democratic party for some three decades.... Although we have informed you of these matters and other details, we wish to make it clear that this information is entirely hearsay so far as the Foundation is concerned and it cannot and does not warrant the correctness or completeness of this information.

> The payees of the instruments have also informed the Foundation that in their view there is no legal obstacle to negotiation of the instruments by them.... However, it certainly is clear that the Government of Japan and those of the institutions with whom we have checked do challenge the genuineness and the enforceability of these instruments. In the only case in which any of these instruments was formally presented for payment by our group, a cashier's check purportedly issued by the Dai-Ichi Kangyo Bank was rejected as not

14

genuine after being held by the Bank for 35 days after presentation. The Foundation is, accordingly, unable to warrant and does not warrant the genuineness or enforceability of the instruments.

The April 24, 1986 letter to Hill makes no reference to the fact that Schlei was aware that Lee had been indicted for attempting to sell forged bond certificates.

Signed agreements for the sale or lease of the bond certificates and bank notes between the Foundation and Hill & Associates for the years 1986, 1987, 1988, and 1989[5] were introduced into evidence at trial. Han or Schlei signed these agreements on behalf of the Foundation. Hill promised to advise any potential buyer that the Japanese government disputed the authenticity of the bonds. Hill was also furnished a written disclosure form for distribution to potential customers.[6] The

_____

[5]The 1989 is signed only by Hill. The line provided for Han's signature on behalf of the Foundation is blank.

[6]The disclosure form reads as follows:

September ___, 1988

    Dear _____:

        As you know we have discussed several times various Japanese Certificates of Redemption and Cashiers Checks denomiated [sic] in Japanese Yen, that purport to be issued by the Bank of Japan, the Dai-Ichi Kangyo Bank and other leading Japanese financial institutions.

        It is the purpose of this letter to establish that Hill & Associates, Inc. has made full disclosure of the problems that exist with respect to these instruments, and that none of our discussions have been based on any material misrepresentation or non-disclosure of material facts.

        The payees of the instruments here involved have stated that they believe the instruments were in fact issued by the institutions by whom they purport to have been issued, and that the instruments represent a confidential fund of money (the so-called M-Fund) which has been administered by the Liberal Democratic party for some three decades. The fund is believed to have been established during the U.S. occupation with the approval of General MacArthur, and to have been the subject of several secret agreements between the U.S. and Japan or the Liberal Democratic Party culminating in the giving up by the U.S. in the late 1950's of any right to participate in administration of the fund. Although I have informed you of these matters and other details, I wish to make it clear that this information is entirely heresay [sic] so far as I am concerned and I cannot and do not warrant the correctness or completeness of this information.

        The payees of the instruments have also stated that in their view there is no legal obstacle to negotiation of the instruments by them; that opposition by the Government of

15

language contained in the disclosure form was virtually identical to that contained in the April 24, 1986 letter to Hill quoted above. It makes no reference to Lee's earlier arrest for attempting to sell forged bond certificates.

On July 2, 1991, Hill called Agent Phil Rence of the FBI at the request of a law firm he had contacted regarding an attempted sale of the bond certificates. Hill informed Agent Rence that he had been involved in the sale of these instruments for approximately six years. Hill stated that he previously had offered bond certificate number 1261 for sale. Agent Rence notified Hill that he had taken a copy of bond certificate 1261 to the Japanese consulate in San Francisco. A Ministry of Finance representative provided the FBI with a letter that stated that the certificate was not genuine.

Approximately one week after his conversation with Agent Rence, Hill received bond certificate 1261 from Bobby Chamberlain, Takahashi's accountant. In November 1991, Hill asked Agent Rence whether he was doing anything wrong in continuing to try and sell the bond certificates in view of the fact that he intended to have any prospective buyer sign an agreement in which the

---

Japan or the Liberal Democratic Party is merely political and not legally sustainable. However, it certainly is clear that the Government of Japan and those of the institutions do challenge the genuineness and the enforceability of these instruments. In the only case in which any of these instruments was formally presented for payment, a cashier's check purportedly issued by the Dai-Ichi Kangyo Bank was rejected as not genuine after being held by the Bank for 35 days after presentation. Hill & Associates, Inc., is, accordingly, unable to warrant and does not warrant the genuineness or enforceability of the instruments.

Essentially, Hill & Associates, Inc., is stating to you that these instruments are without warranty other than a warranty that it has duly acquired the proper power of attorney in and to these instruments. By your signature below, you acknowledge receipt of the information set forth above and your understanding of the severe limitations on the warranty in relation to any proposed transactions between _____ and Hill & Associates, Inc.

Sincerely,

_____

Roger A. Hill, President

HILL & ASSOCIATES, IC.

Acknowledged: September ____,1988

16

purchaser acknowledged that he or she had been informed that the genuineness of the bond certificate was in dispute. Agent Rence told Hill that the bond certificates were "bogus," and that no "buyer-beware clause" would help him if he continued to try to sell the bond certificates.

During Hill's negotiations with the Foundation, he met with Han and Takahashi in Schlei's office. Hill saw at least fifty of the bond certificates on Schlei's coffee table.

Hill made several attempts to sell the bond certificates and the bank notes prior to January 18, 1992. None was successful.

b. *The Role of Ah Loo and Howard Olson in Attempting to Negotiate the Financial Instruments*

Beginning in December 1986, Ah Loo conducted business in Hong Kong as Transfield Investments Limited ("Transfield"). In September 1987, Ah Loo negotiated with John Blomfield of Merrill Lynch, Pierce, Fenner and Smith regarding the sale of "Japanese debentures." During the course of their correspondence, Blomfield sent Ah Loo a copy of an unsigned letter he had received, dated February 28, 1987, from Minoru Yoneda, an associate advisor in the Government Bond Department of the Bank of Japan in Tokyo. This letter provided in pertinent part that "[i]n Japan, the Government do [sic] not issue the Certificate of Redemption Balance that you sent us in the copy-form. Such Certificate is not a true bond, but a fictitious one, and we reg[r]et to inform you that the Certificate is often used in fraudulent practices."

On October 1, 1987, Takahashi granted Kelly Chang and Lau Jim Koon his power of attorney to "negotiate on [his] behalf with investment consultant firms, financial consortium, banks and trust body [sic] as may be deemed qualified and necessary for the investment of these Debentures." On October 15, 1987, Koon and Chang assigned bond certificates to Transfield to assist "in the disposition of said Bonds."

On October 28, 1987, Schlei wrote to Ah Loo's bank in Hong Kong, "[a]t the request of [his] client, Mr. Toshio Takahashi," to verify that funds were available to pay for the assignment of the bond certificate to Transfield. Schlei also attached an affidavit, in which he alleged that he possessed bond certificates 1276, 1280, 1354, and 1664, and advised that pursuant to instructions

17

from his client, he was prepared to deliver the bond certificates to a buyer. Over the ensuing months, Ah Loo and Alistair Robertson, her attorney, communicated with Takahashi and Schlei regarding her efforts to sell the bond certificates.

In January 1988, Ah Loo contacted Howard Olson, a resident of Minot, North Dakota, to discuss his interest in obtaining financing for a proposed real estate development. Ah Loo had met Olson when she resided in Nevada in 1985. In 1985, Olson and Ah Loo had discussed Olson's plans for a condominium project in North Dakota, and his need for two to three million dollars in financing. When Ah Loo moved to Hong Kong in December 1986, she continued to assist Olson in attempting to obtain financing for Olson's real estate development. Ah Loo also authorized Olson to serve as a special representative of Transfield. She gave him a power of attorney with respect to a bank account in the name of Transfield at First American Bank & Trust of Minot ("First American").

Ah Loo first mentioned the bond certificates to Olson in January 1988. Olson told Ah Loo that he thought he could use one of the bond certificates as collateral for a loan on his development project. In February 1988, Ah Loo sent bond certificate number 1395 to First American. Olson then transferred bond certificate 1395 to E.F. Hutton Securities ("E.F.Hutton"). E.F. Hutton served as his broker in negotiations concerning the instrument. E.F. Hutton requested that Shearson Lehman determine whether the instrument was valid. After making an inquiry through its Tokyo office, Shearson Lehman informed E.F. Hutton that the bond certificate was forged. E.F. Hutton immediately advised Olson that they would not accept the bond certificate because it was "no good." Shortly thereafter, the FBI ordered Olson to cease and desist his attempts to negotiate the bond certificate. Olson informed Ah Loo of the FBI's warning, as well as E.F. Hutton's refusal to deal with the bond certificate.

Once Olson's plan to use the bond certificate as collateral for a bank loan failed, Olson began negotiating with Paul Bennett, who indicated that a pension fund he represented was interested in purchasing the bond certificate. In the first half of March 1988, Olson and Schlei had several

18

telephone conversations regarding the potential sale of the bond certificate to the pension fund. Olson testified that he informed Schlei that E.F. Hutton "didn't want to deal with [the bond certificate]." In addition, Olson advised Schlei of the FBI's warning. Nevertheless, Schlei told him to continue his efforts to sell the bond certificate.

On March 9, 1988, Takahashi sent a letter to Olson demanding either $2,362,205 in payment for bond certificate 1395, or immediate return of the instrument to Schlei as Takahashi's representative. On March 11, 1988, Schlei sent a letter to Ah Loo which included the following:

> Mr. Takahashi has asked me to advise you that, because of repeated failures by you and your representatives to carry out the terms of your agreement for the purchase of the [bond certificate No. 1395], he has terminated the agreement and hereby makes demand on you to return the Certificate or cause it to be returned forthwith. Since the certificate is now in the United States in the possession of Howard Olson, Mr. Takahashi asks that the certificate be delivered to me as his representative.

On March 18, 1988, Olson informed Schlei that Olson would be dealing directly with Schlei regarding bond certificate 1395, and that Ah Loo would no longer participate in the pending negotiations with the pension fund. That same day, Schlei sent a letter to Takahashi concerning Olson's efforts to sell the bond certificate. It reads in pertinent part as follows:

> I have your fax of today and understand fully your concerns. I will cancel the transaction with Olson if you feel we must do so.

> However, before cancelling as you have requested I would like to report my latest communications with Olson.

> Mr. Olson states that he knows almost nothing about the history of this matter in Hong Kong. I have told him some of the bad things done by Ah Loo and Taguchi and he says he cannot blame you for being angry. However, he adds, he did not participate in those things and feels he has been completely fair and honest with us.

> Olson readily admits that the form of this transaction has changed since he first became involved. Originally, he says, he had arranged to do a transaction involving the Shearson Lehmann [sic] firm. This transaction also involved Mr. Searcy's bank and was at one time ready to close. However, Shearson withdrew as a result of its contacts with the Bank of Japan. Therefore, Olson had to make different arrangements.

> Olson says the transaction he has arranged is the same one he described to me when I first called him, namely, a transaction involving a pension fund. Olson's company would be buying *our* certificate and using it (and certain mining properties being pledged by Olson) to borrow money from a pension fund headquartered in Denver. The money being lent by the pension fund would be used to pay the purchase price *to us*.

19

....

> For all of the above reasons, I recommend that you hold off cancelling Olson's transaction.

(emphasis added).

Olson's proposed sale of bond certificate 1395 to the pension fund fell through in April 1988. At that time, bond certificate 1395 was in Bennett's possession. Olson instructed Bennett to mail the instrument to Schlei. Schlei also directed Bennett to return the bond. Bond certificate 1395 was never returned to Schlei. Olson had no further direct contact with Schlei after April 1988.

On April 22, 1988, Olson wrote the following letter to Dr. Carmelo Profilo and Chang, Ah Loo's business associates:

> Once again I have experienced a rejection of a proposed sale of one of the Certificates of Redemption due to influence created by the Issuing Government.
>
> The Certificate had been sold and an escrow opened subject to the Buyer checking with the government of the Issuing Country. The reason for checking was that this Buyer (A Prince) is involved on another deal with them of several Billion Dollars on a different Project, and he needed to know that this purchase would not change their relationship or nullify any of their plans. The response was very negative, and the Buyer was forced to drop this purchase immediately and stay clear of those Certificates. The Buyer was also partners with several Senators in the deal and gave strong repercussions back to me, and I was again notified by the Federal Authorities to seize [sic] and desist all operations concerning these Certificates.
>
> I have begin [sic] the process of returning the Certificate and all the Supporting Documents to Transfield immediately.

On October 7, 1988, Ah Loo was informed by an attorney, with whom she had been dealing with respect to the sale of the bond certificates, that officials at the Bank of Japan had determined that they were forgeries, and were "exactly the same as copies used in a previous case of fraud in Hong Kong."

c. *The Attempted Sale of Bond Certificates to Kazimir Golac by Schlei and Takahashi*

The record shows that, late in 1988, Schlei and Takahashi attempted to sell several bond certificates to Kazimir Golac. In a letter to Schlei, dated October 14, 1988, Takahashi set forth a proposed distribution of the proceeds from the anticipated Golac sale. The letter provided that half of the income should go to the Foundation from the sale of "your and my shares" of the ten billion

yen bond certificates. Takahashi also suggested that the Foundation should get fifteen billion yen "from our share of the sale of the Y300 billion bond certificates." Takahashi explained that "personally and privately your income will be 1.8bs + 3.0bs = 4.8 billion japanese yens. Mine is the same." Takahashi also recommended that the proceeds of the sale, excluding those designated for the Foundation, should be divided equally among Han, Schlei, and Takahashi. The Golac transaction was never consummated.

d. *Craig Ivester's Role in Attempting to Negotiate the Financial Instruments*

Sometime during 1987 or 1988, Ah Loo was introduced to Craig Ivester. Ivester was employed by Bancorp International as a finder of commodity transactions. Ivester informed Ah Loo that he had prospective buyers for the bond certificates. Ah Loo furnished Ivester with a copy of a bond certificate. Ivester sent the copy of the bond certificate to Bancorp International. Bancorp International presented the copy of the bond certificate to UVS Switzerland. UVS Switzerland later reported to Bancorp International that the bond certificate was fraudulent. Ivester relayed this information to Ah Loo.

3. *The Sting Operation*

In August 1991, Ah Loo was reintroduced to Ivester by Dallas Thompkins. Ivester was assisting Thompkins in attempting to obtain financing for Thompkins's company, Mid-Way Capital.

Ivester and Ah Loo discussed the bond certificates. Thereafter, Ivester contacted Special Agent Noonan of the United States Customs Service, to determine whether he was interested in investigating Ah Loo's involvement with the bond certificates. Ivester had previously worked with Agent Noonan as a confidential informant. After Agent Noonan expressed interest in pursuing the investigation, Ivester arranged to meet Ah Loo on September 11, 1991. At this meeting, Ivester told Ah Loo that he represented a group interested in purchasing bond certificates. On September 12, 1991, Ah Loo sent Ivester a copy of a document entitled "Private Placement Procedures," and copies of two bond certificates. Ivester forwarded these documents to Agent Noonan. Agent Noonan shared the information he had received from Ivester with Secret Service Agent Jack Fox.

21

Ivester arranged the initial meeting between Ah Loo and his alleged prospective buyers. This meeting occurred in Reno, Nevada in October 1991. In attendance were Ivester, Ah Loo, Agent Fox, and Customs Service Special Agent Michael Sankey. Agent Fox introduced himself as an officer of the First National Bank of Chicago. Agent Sankey identified himself as Michael Montclair, the president of a large international investment company. The conversation was surreptitiously recorded by the agents.

During the Reno meeting, Ah Loo explained to Agent Fox and Agent Sankey that General MacArthur, in an attempt to shorten the supply lines for the Korean War, created a fund to permit Japan, which at the time was prohibited from developing its military, to manufacture munitions for use in the Korean War. She stated that the proceeds for the fund were obtained from the money and property of certain persons who had been loyal followers of the Emperor of Japan. In exchange, these investors received bond certificates. Ah Loo also informed Agent Fox and Agent Sankey that the bank notes had been issued as payment for redemption of the bond certificates, but that someone had printed an overrun of these bank notes. She told the agents that the excess bank notes were fraudulent.

Ah Loo warned Agent Fox and Agent Sankey that they might not want to purchase the bond certificates because some persons had been arrested, and others killed, for dealing in these financial instruments. She also represented that the bond certificates would not be redeemed at maturity, but would be rolled over. Agent Fox and Agent Sankey expressed interest in purchasing one bond certificate, but no agreement was reached during the Reno meeting.

In early September 1991, Hill was introduced to Ah Loo by J. Maillian. Maillian informed Ah Loo that he was representing Hill in his efforts to sell bond certificates. At this time Ah Loo did not have any of the bond certificates in her possession. Hill agreed to make a bond certificate available to Ah Loo for sale to Agent Fox and Agent Sankey.

On September 20, 1991, Hill signed a handwritten agreement drafted by Takahashi in which Hill agreed to sell three bond certificates and one bank note. This agreement provides that Hill and

Takahashi "should keep strict secrecy from anyone regarding this agreement and should not disclose to any one [sic] else for ever [sic] without written agreement by Both." The agreement is signed by Hill as "Party A," and Takahashi as "Party B." Takahashi provided Hill with three bond certificates, including number 1261, and bank note 59155. On the same date, Takahashi placed nine calls to Schlei, from his hotel room at the Sheraton Grande in Los Angeles. The record also shows that Schlei paid Takahashi's hotel bill.

Hill testified that he did not inform Takahashi that Ah Loo was involved in the transaction. Hill also testified that Takahashi had informed him that Schlei did not want Takahashi to deal with Hill.

Ah Loo met again with Agent Fox and Agent Sankey in early December 1991. Ah Loo represented to the agents that the bond certificates could be redeemed, but not everyone could redeem them. She told the agents that the bonds had already been certified as valid in the Japanese courts, and that she had originally obtained one of these instruments in Hong Kong from Schlei, a former assistant attorney general of the United States. During this meeting, they did not reach an agreement on the terms of the sale of the bond certificate. In late December 1991, Agent Fox informed Ah Loo that he preferred to use the Smith Barney office in Tampa as the escrow agent.

Throughout the early part of January 1992, Agent Fox and Ah Loo communicated by telephone to discuss final arrangements for the sale of the bond certificate. On January 7, 1992, Ah Loo, Ah Loo's son Bruce Hansberry, and Lee met at Ah Loo's residence in Los Angeles to discuss the acquisition of additional bond certificates by Lee. Hansberry testified that during this meeting "the validity or authenticity of these bonds were [sic] brought into question regarding [Lee's] involvement in an effort by the FBI to confiscate the bonds from [Lee]." Although this meeting was unrelated to the sale of the bond certificate to Agent Fox and Agent Sankey, Hansberry testified that "[t]he [bond certificate] series was the same. The question was implanted, there were doubts."

On January 9, 1992, A. George Saks, the executive vice president and general counsel of Smith Barney, signed a proposal letter, at Agent Fox's request, that set forth Smith Barney's

purported willingness to purchase three "Series 57 Certificates of Balance of Redemption Japanese National Bonds" from Ah Loo for $140 million. In return, Smith Barney's fee for its services as escrow agent was set forth as $1.4 million.

Ah Loo assured Agent Fox that, at the closing, someone would explain to him how to certify the bond certificate's authenticity. Hansberry told Agent Fox that he had already sold three of the bond certificates. Hansberry admitted after his arrest that this representation was false.

The parties agreed that the purchase price for one bond certificate would be one hundred million dollars. Of that amount, Ah Loo was to receive nineteen million dollars, Smith Barney would be paid one million dollars for its services, and Hill was to receive eighty million dollars. Hill agreed to pay Takahashi twenty million dollars.

On January 16, 1992, Hill and Takahashi met in Takahashi's hotel room at the Sheraton Grande in Los Angeles. Takahashi told Hill that his twenty million dollar share of the proceeds from the sale to Agent Fox and Agent Sankey would be divided between Han, Schlei, Sakai, Horiguchi, and himself. Takahashi's notes reflecting this division of the proceeds were described at trial as the "payout sheet." Takahashi told Hill at the January 16, 1992 meeting that Schlei knew that a bond certificate transaction was closing.

On January 17, 1992, Hill and Hansberry traveled to Tampa to deliver the bond certificate to Agent Fox and Agent Sankey. Because of medical problems, Ah Loo did not attend the meeting, but participated by telephone. On January 18, 1992, Hill handed bond certificate 1291 to Agent Fox. Immediately thereafter, Hill and Hansberry were arrested.

At the time of their arrest, Hill and Hansberry admitted that they knew that bond certificate 1291 was fraudulent. Hill consented to a search of the safety deposit box assigned to him at the Embassy Suites Hotel in Tampa. The search disclosed additional bond certificates, bank note 59155, the disclosure form, a copy of the United States embassy letter identified at trial as Exhibit 21, and Takahashi's "payout sheet" for the Tampa transaction.

Hill placed a telephone call to Takahashi following his arrest. On the same date, Takahashi made eleven phone calls to Schlei, including two that were placed immediately after he spoke with Hill over the telephone.

On January 19, 1992, agents searched Takahashi's Los Angeles hotel room. The room was registered to Osamu Sakai. It was vacant, although food, clothes, and documents were scattered throughout. Takahashi made four phone calls to Schlei on January 19; twenty-one on January 20; and twenty on January 21. At the time of trial, Takahashi was a fugitive.

4. *Proof that the Instruments Were Forgeries*

At trial, the Government presented the testimony of Hideo Inoue, the special officer for research at the Government Bond Section of the Ministry of Finance in Japan, regarding the authenticity of the bond certificates. He testified that the bond certificates were not genuine. Inoue compared the bond certificates with genuine Japanese bonds. He identified the following distinguishing characteristics: (1) the bond certificates did not contain the term "Government of Japan," which appears on genuine Japanese bonds; (2) the Japanese government has never issued an instrument termed a "certificate of redemption"; (3) the bond certificates contain the letter "A," which does not appear on genuine Japanese bonds; (4) the numbering on the bond certificates appeared to have been rubber stamped, whereas genuine bonds contain a "very clear number," because of the special technology that is used; (5) the bond certificates used four-digit numbers, whereas genuine bonds contain six-digit numbers; (6) the bond certificates contained the words "Dai-Ichi Kangyo Bank," but genuine bonds do not refer to any private bank; (7) the bond certificates contained Japanese/Chinese characters with a horizontal line through them that genuine bonds do not include; (8) the bond certificates had the name of the nominee and genuine bonds do not bear the name of any person as the bondholder; (9) the seal on the bond certificates was slightly faded, not as clear, and a less-bright red than genuine Japanese bonds, and the lines around the seal of the bond certificates were thicker than around that of genuine bonds; (10) the bond certificates had face amounts of between ten and fifty billion yen, but the government of Japan has never issued

a bond in an amount greater than one billion yen; (11) the bond certificates did not have the raised print and Ministry of Finance watermarks that genuine bonds contain; and (12) the reverse side of the bond certificates did not contain the same design and warning as that on genuine bonds.

Takashi Iwanaga, a vice president of the Manhattan branch of the Dai-Ichi Kangyo Bank, testified regarding the authenticity of the bank notes. Iwanaga described the physical differences between the bank notes and a genuine Dai-Ichi Kangyo Bank cashier's check issued in 1982. Iwanaga told the jury that the bank notes were counterfeit.

5. *Proceedings in the District Court*

Schlei was charged in Count One of the second superseding indictment with conspiring with Ah Loo, Hill, Hansberry, Takahashi, and Alan Reedy (1) to utter and pass falsely made, forged and counterfeit Japanese bonds in violation of 18 U.S.C. § 479; (2) to possess and deliver false and counterfeit foreign bank notes in violation of 18 U.S.C. § 480; (3) to use interstate wires in execution of scheme to defraud in violation of 18 U.S.C. § 1343; (4) to execute a scheme to defraud a bank in violation of 18 U.S.C. §§ 2 and 1344; (5) to offer or sell securities by employing a scheme and artifice to defraud in violation of 15 U.S.C. § 77q; and (6) to engage and attempt to engage in a monetary transaction in criminally derived property that is of a value greater than $10,000 in violation of 18 U.S.C. § 1957. The jury was furnished with a special verdict form. The jury found Schlei guilty of conspiracy. The jury found that the object of the conspiracy in which Schlei participated was "[t]o possess and deliver false and counterfeit bank notes, in violation of 18 U.S.C. § 480." The jury also found that it was not an object of Schlei's conspiracy "[t]o utter and pass falsely made, forged, and counterfeit Government of Japan Series 57 M-Bonds, in violation of 18 U.S.C. § 479."

Schlei was found not guilty of uttering or passing false, forged, and counterfeit bonds, five counts of wire fraud, bank fraud, and engaging in a monetary transaction involving unlawfully derived property. Schlei was found guilty of securities fraud in violation of 15 U.S.C. §§ 77q and 77x. The jury found specially that "[Schlei] obtained money or property by means of any untrue

26

statement of a material fact or any omission to state a material fact necessary in order to make the statements made in light of the circumstances under which they were made, not misleading."

B. *Discussion*

1. *The Evidence Demonstrates that Schlei Affirmatively Misled Potential Purchasers Regarding Material Facts*

Schlei argues that the evidence presented to the jury is legally insufficient to demonstrate that he committed fraud—an essential element of conspiracy to commit fraud and the substantive offense of securities fraud charged in Count Ten of the second superseding indictment. Schlei contends that the Government failed to present evidence that he was involved in a scheme "reasonably calculated to deceive persons of ordinary prudence and comprehension." He argues that pursuant to the rule announced in *United States v. Brown,* 79 F.3d 1550 (11th Cir.1996), we must reverse. We disagree. The facts and circumstances presented to the jury in this matter are readily distinguishable from those reviewed by this court in *Brown.*

In *Brown,* the defendants represented to prospective customers from snow-belt states that the homes they were selling in Florida were a safe business investment and could be rented for an amount greater than the mortgage payments. *Id.* at 1554. In fact, the houses were being sold at a higher price than an almost identical home next door. The houses were not a good investment because they were overpriced. The rental income was less than represented. Some of the purchasers resold their homes for much less than they paid. *Id.*

In reversing the judgment of conviction, this court held that "[a] "scheme to defraud' under the pertinent criminal statutes has not been proved where a reasonable juror would have to conclude that the representation is about something which the customer should, and could, easily confirm—if they wished to do so—from readily available external sources." *Id.* at 1559. Applying this rule to the facts before it, this court concluded that potential home buyers were encouraged to travel to Florida at the expense of the developer to visit the properties offered for sale. The court noted that "this matter is not a "sale of distant property' case: the kind where the purchaser has no chance to investigate the property's condition and value." *Id.* at 1560. The court held that reliance on the

27

value representations was unreasonable because a person of ordinary prudence could have easily discovered the cost of buying or renting comparable properties in Florida. *Id.* at 1551.

Here, unlike the situation in *Brown,* we have a "distant property" case. The conspirators represented that "a secret fund to be used for various purposes not suitable for public view" was created in Japan by General MacArthur and Japanese officials approximately fifty years ago. They also claimed that the government of Japan issued the financial instruments to persons who contributed to the secret fund, but that corrupt Japanese officials were now falsely claiming that they were not genuine. In making these representations, the conspirators told prospective purchasers that a former assistant attorney general of the United States had determined that the financial instruments were genuine and negotiable. Furthermore, a document typed on the letterhead of the United States embassy was shown to potential customers to persuade them that "the United States was supporting Mr. Schlei."

Under these circumstances, a reasonable juror could be persuaded beyond a reasonable doubt that a potential customer could not easily confirm the truth of the representation that a secret fund allegedly created by persons who have since died is now being covered up by a corrupt government of Japan. The conspirators represented that the financial instruments were genuine, but that the government of Japan would deny that the financial instruments were genuine. Had any potential customer of the conspirators and their salespersons attempted to contact the government of Japan, he or she would have been confronted with a self-fulfilling prophecy. Because the instruments were not genuine, the Japanese Minister of Finance would undoubtedly inform any person who inquired that the bond certificates and bank notes were worthless. The exercise of ordinary intelligence would not have assisted a potential customer in confirming from a readily available external source that the conspirators' representations were truthful. We decline to extend *Brown* to the false representations made by the conspirators to this fraudulent scheme.

2. *Sufficient Evidence Was Presented to Support the Judgment of Conviction for Conspiring to Sell the Fraudulent Bank Notes*

Schlei also maintains that "[n]o evidence was presented at trial showing that Schlei or anyone else engaged at any time in fraudulent behavior with respect to the "bank notes.' " The record does not support this argument.

Schlei entered into an agreement with Hiraki, Takahashi, Lee, and Han concerning the negotiation and cashing of bank notes drawn on the Dai-Ichi Kangyo Bank in the spring of 1985. In May of that year, Schlei and Lee attempted to cash one of the bank notes at the Dai-Ichi Kangyo Bank in Japan. They were informed that the bank note was not genuine. Nevertheless, on May 7, 1986, Schlei, as secretary and treasurer of the Foundation, assigned a bank note described as "cashier's check No. A35240" to Hill & Associates, Inc. The disclosure form letter that Schlei presented to Hill for distribution to potential purchasers expressly referred to cashier's checks "that purport to be issued by the Dai-Ichi Kangyo Bank." Thus, contrary to Schlei's assertion, members of the conspiracy entered into an agreement to sell fraudulent bank notes after Schlei and Lee had been informed by a representative of the Dai-Ichi Kangyo Bank that they were not genuine.

The record also discloses that Hill was furnished an additional bank note by Takahashi on September 20, 1991. Takahashi was aware that Hill was involved in the proposed sale of a bond certificate to Agent Fox and Agent Sankey. One of the bank notes was seized from Hill following his arrest in Tampa, Florida. This evidence was sufficient to persuade a rational juror that the members of the conspiracy, including Schlei, had not abandoned their agreement to sell bank notes that were known to be worthless prior to January 18, 1992. The fact that no bank notes were successfully negotiated does not affect the validity of the judgment of conviction for conspiracy to sell them. *See United States v. Cuni,* 689 F.2d 1353, 1356 (11th Cir.1982) ("[W]hether the object of the conspiracy is achieved is immaterial to the commission of the crime of conspiracy.").

3. *The Evidence Is Sufficient to Demonstrate that Schlei's Misrepresentations and Concealment Were Material*

Schlei asserts that the representations made by the alleged conspirators did not relate to a material fact. He argues that the only fact that is material to a prospective purchaser of a financial instrument is "whether the instrument will be paid when due." Schlei contends that where it is

29

represented that a financial instrument will not be paid "other information that might indirectly suggest a possibility or probability of nonpayment becomes merely cumulative and is immaterial." Schlei's argument ignores the fact that he and his coconspirators represented that the financial instruments were genuine. Clearly, a representation of genuineness is material to a prospective purchaser of an alleged negotiable instrument. Perhaps of more significance, however, is the fact that Schlei and his coconspirators concealed the fact that Schlei knew that Aoyagi had been convicted in a Japanese court for participating in producing forged bond certificates and bank notes. These financial instruments were delivered to persons who transferred them to the Foundation. Schlei also concealed from the Foundation's salespersons and prospective purchasers the fact that after hearing Aoyagi's sworn testimony, when asked his opinion regarding the genuineness of the bond certificates, Schlei stated to Stein and AUSA Green: "I agree. They can't be real after listening to this."

Notwithstanding his firm conviction that the bond certificates and bank notes were forged, Schlei did not withdraw from the conspiracy. Instead, on January 18, 1992, he was still actively involved in attempting to negotiate forged financial instruments that were in the possession of the officers of the Foundation. This evidence was sufficient to persuade a rational juror that Schlei misrepresented and concealed material facts.

4. *The Evidence Was Sufficient to Convict Schlei of Conspiracy to Sell Fraudulent Bank Notes*

Schlei contends that the evidence is insufficient to convict him of conspiracy to sell forged bank notes because he did not personally participate in the Tampa transaction. Schlei also argues that the district court erred in denying his motion for judgment of acquittal because the record shows he had no knowledge that Hill and Ah Loo were planning to sell a bond certificate furnished by Takahashi.

A person who is involved in a conspiracy from which he or she has not withdrawn is "responsible for any later act of a co-conspirator which was a necessary or natural consequence of

30

the conspiracy." *United States v. Marable,* 574 F.2d 224, 230 (5th Cir.1978).[7] "Each party to a continuing conspiracy may be vicariously liable for substantive criminal offenses committed by a co-conspirator during the course and in the furtherance of the conspiracy, notwithstanding the party's non-participation in the offenses or lack of knowledge thereof." *United States v. Mothersill,* 87 F.3d 1214, 1218 (11th Cir.), *cert. denied sub nom. Johnson v. United States,* --- U.S. ----, 117 S.Ct. 531, 136 L.Ed.2d 416 (1996).

As set forth above, the undisputed evidence shows that Schlei entered into a written agreement to sell bond certificates and bank notes with knowledge that the government of Japan and the Dai-Ichi Kangyo Bank had declared that these instruments were not genuine. The record shows that Schlei did not withdraw from the conspiracy to sell these forged instruments prior to January 18, 1992.[8] Accordingly, Schlei is responsible as a coconspirator for Takahashi's transmission of a forged bond certificate to Hill for sale to prospective buyers. As a conspirator, Schlei is also responsible for Hill's attempt to sell the bond certificate in Tampa, Florida because that transaction was a necessary consequence of the ongoing conspiracy to sell the financial instruments.

While the evidence that Schlei entered into an agreement with Lee, Han, Hiraki, and Takahashi to sell the bond certificates and the bank notes is undisputed, the jury found that Schlei conspired to sell the bank notes, but not the bond certificates. We have no clue regarding the basis for this curious determination. Schlei argues that the jury's finding that Schlei was not involved in a conspiracy whose object was "[t]o utter and pass ... Government of Japan Series 57 M-Bonds" demonstrates that "the jury intended to acquit Schlei of involvement in the Tampa transaction." This argument ignores the fact that the sale of a bond certificate was a necessary or natural consequence of an agreement to sell fraudulent bank notes also furnished to its salespersons by the Foundation.

---

[7]In *Bonner v. City of Prichard,* 661 F.2d 1206, 1207 (11th Cir.1981) (*en banc* ), this court adopted as binding precedent all decisions of the former Fifth Circuit rendered prior to October 1, 1981.

[8]One month prior to the Tampa transaction, Takahashi attempted to resign from the Foundation and suggested that the Foundation be dissolved. The record establishes that Schlei recommended that the Foundation should continue for another two months.

Sale of the bond certificate in Tampa, Florida was in furtherance of the conspiracy to negotiate fraudulent financial instruments allegedly evidencing a debt owed by the government of Japan. We are persuaded that the evidence was sufficient to support Schlei's conviction for conspiracy to sell forged bank notes.

## II

## JURY INSTRUCTIONS

Schlei challenges the district court's refusal to instruct the jury on seriatim conspiracies, which was his theory of defense. He also challenges the district court's refusal to instruct on the liability of corporate officers for acts of other officers. In addition, he asserts that the district court erred in its instructions to the jury regarding deliberate ignorance and the definition of securities.

We review the district court's refusal to give a defendant's requested jury instructions for an abuse of discretion. *United States v. Chirinos,* 112 F.3d 1089, 1101 (11th Cir.1997). "The district court has broad discretion in formulating a jury charge as long as the charge as a whole is a correct statement of the law." *United States v. Perez-Tosta,* 36 F.3d 1552, 1564 (11th Cir.1994), *cert. denied sub nom. Perez-Aguilera v. United States,* 515 U.S. 1145, 115 S.Ct. 2584, 132 L.Ed.2d 833 (1995). "We will not reverse a conviction unless we find that issues of law were presented inaccurately or the charge improperly guided the jury in such a substantial way as to violate due process." *Id.*

A. *Theory of Defense—Seriatim Conspiracies*

Schlei maintains that the district court abused its discretion when it denied his requested jury instructions regarding seriatim conspiracies. "The district court should instruct the jury on the defendant's defense theory if the theory has a foundation in evidence and legal support." *Chirinos,* 112 F.3d at 1101. If the instruction would not assist the jury in deciding the issues before it, the district court need not grant defendant's request. *Id.*

> In determining whether the district court abused its discretion in refusing to give the requested jury instruction, this court considers three factors: (1) whether the requested instruction is a substantially correct statement of the law; (2) whether the jury charge given

addressed the requested instruction; and (3) whether the failure to give the requested instruction seriously impaired the defendant's ability to present an effective defense.

*Id.*

Schlei's theory of defense centered around the written agreements to sell the instruments that were presented at trial. Schlei argues that

[t]hese agreements, whether lawful or not, ended by their own terms and were abandoned years before the Tampa "sting" transaction was initiated. Some of the principals terminated their relationships and had no further contact with each other. [Even if Schlei] had joined an early "conspiracy," that would not mean that he was a member of the last conspiracy, which was the one that ended in Tampa, and was the only one that could be charged in the Middle District of Florida.

Schlei requested that his theory of defense be set forth in the following requested jury instructions:

### NORBERT SCHLEI'S REQUESTED INSTRUCTION NO. 2

You must decide whether the evidence presented proves the existence of a single conspiracy, a series of separate conspiracies, or whether it fails to prove any conspiracy at all. If you find that there is proof beyond a reasonable doubt that at least one conspiracy existed, you must next consider whether the evidence proves beyond a reasonable doubt the existence of a single continuous conspiracy or whether instead it shows a series of separate conspiracies. Separate conspiracies exist when each of the agreements has its own end. For instance, a transaction or episode may be separate and distinct from any other transaction, thus constituting an end in itself.

The question whether there was a single conspiracy or multiple conspiracies focuses on the nature of the agreement or agreements between the alleged conspirators, because it is the agreement that defines the scope of any conspiracy. When I use the word "agreement" I mean the coming together of two or more minds in mutual understanding on a particular proposition or for a particular purpose. The agreement represents mutual assent.

Looking to the agreement involved, then, you must consider what that agreement was. There is no requirement that there can be a formal written document describing the agreement, but if there is such a written document, you may consider that written description of the agreement as evidence of such things as who participated in the agreement; what the purpose of the agreement was; the agreed method for carrying out the agreement; and when the agreement was to end or in fact did end.

### NORBERT SCHLEI'S REQUESTED INSTRUCTION NO. 3

A conspiracy ends when its objectives have either been accomplished or abandoned. After a conspiracy ends, it is possible that the participants would form new agreements with other people or with the same people. If a new unlawful agreement is reached after a conspiracy has ended, the new agreement constitutes a new and separate conspiracy. The participants in the new conspiracy are only those people who have come to a mutual understanding to try and accomplish the objectives of the new agreement. A participant in an old agreement that was either accomplished or abandoned does not become a participant in a new conspiracy unless he or she knowingly and willfully agrees to the new agreement.

33

You must consider each defendant separately and decide whether that defendant was a member of the specific conspiracy described in count one of the indictment. When I speak of "the specific conspiracy charged in count one," I mean a conspiracy meeting the general description contained in count one and that includes at least one overt act in Tampa, Florida, and at least one overt act within the period from October 8, 1987, to January 31, 1992. If you find that a defendant was not a member of the specific conspiracy charged in count one, you must state that the defendant is not guilty of count one, even if you decide that the defendant was a member of some other conspiracy that is not the specific conspiracy described in count one.

(citations omitted).

Schlei contends that because the district court rejected his requested instruction that a conspiracy ends when its objectives have either been accomplished or abandoned, the jury "could have convicted [him] on Count One because they found that he had joined in an agreement at some remote time or place that ended long before the alleged conspiracy over which the court had jurisdiction." The district court did not abuse its discretion in denying the proffered instructions on seriatim conspiracies because there is no evidence in the record that Schlei withdrew from the original conspiracy to sell the fraudulent bank notes. Instead, the evidence shows that the original conspirators met to discuss the future of the Foundation after the arrests of Hill, Hansberry, and Ah Loo on January 18, 1992. While it is true that separate agreements were entered into with Olson, Hill, and Ah Loo to enlist their efforts in selling the financial instruments, the evidence is uncontradicted that the agreement between Schlei, Han, and Takahashi to sell the bond certificates and the bank notes by using the Foundation was never abandoned. The effect of Schlei's proposed instructions would have been to admonish the jury that although the objects of the conspiracy were not abandoned by his coconspirators, Schlei could not be found guilty because he abandoned the conspiracy. This is not an abandonment theory, but rather a withdrawal argument. It was an attempt to require the jury to consider the defense of withdrawal from the conspiracy. There is no evidentiary support for the defense of withdrawal from a conspiracy.

To establish the affirmative defense of a withdrawal from the conspiracy, the defendant has the substantial burden of proving: (1) that he has taken affirmative steps, inconsistent with the objectives of the conspiracy, to disavow or to defeat the objectives of the conspiracy;

and (2) that he made a reasonable effort to communicate those acts to his co-conspirators or that he disclosed the scheme to law enforcement authorities.

*United States v. Starrett,* 55 F.3d 1525, 1550 (11th Cir.1995), *cert. denied sub nom. Sears v. United States,* --- U.S. ----, 116 S.Ct. 1335, 134 L.Ed.2d 485 (1996).

Schlei has not demonstrated that he informed Han and Takahashi that he no longer intended to be involved in their joint plan to sell the fraudulent financial instruments through the Foundation. To the contrary, when Takahashi attempted to resign from the Foundation in December 1991, and suggested that the Foundation be dissolved, the evidence shows that Schlei recommended that the Foundation should continue for another two months. Furthermore, Schlei did not report the activities of his coconspirators to law enforcement authorities.

The district court charged the jury as follows:

You are further instructed, with regard to the alleged conspiracy offense, that proof of several separate conspiracies is not proof of the single, overall conspiracy charged in the indictment unless one of the several conspiracies which is proved is the single conspiracy which the indictment charges.

What you must do is determine whether the single conspiracy in the indictment existed between two or more conspirators. If you find that no such conspiracy existed, then you must acquit the Defendants of that charge. However, if you decide that such a conspiracy did exist, you must then determine who the members were; and, if you should find that a particular Defendant was a member of some other conspiracy, not the one charged in the indictment, then you must acquit that Defendant.

In other words, to find a Defendant guilty you must unanimously find that he was a member of the conspiracy charged in the indictment and not a member of some other separate conspiracy.

This instruction required the jury to find that there was a single conspiracy. The jury was admonished that if it found that there were several separate conspiracies, but no overall conspiracy, as charged in the indictment, the defendants must be found not guilty. This instruction incorporated Schlei's request that the jury be informed that they could not find him guilty if there was no evidence that he was no longer a member of the conspiracy on January 17, 1992. The district court did not abuse its discretion when it denied Schlei's proposed seriatim conspiracy instructions.

B. *Liability of Corporate Officers*

35

Schlei also requested that the district court instruct the jury that criminal liability cannot be premised solely on a defendant's position in a corporation, based on the acts of others. He requested the following instruction:

> The law does not hold a person criminally responsible for an act in which the accused did not participate and of which he had no personal knowledge. Thus, one officer of a corporation cannot be held liable for the acts of a second officer of the corporation if those acts were taken by the second officer without the knowledge or participation of the first officer. You may not find guilt solely on the basis of a defendant's position as an officer or director of a corporation.

Schlei maintains that the requested instruction was necessary because "the Government, grasping at straws to implicate Schlei in the Tampa transaction, attempted throughout the trial to convey to the jury the idea that Schlei was necessarily involved in the activities of others because he was a corporate officer of the Foundation."

Under the facts of this case, the requested instruction would have confused the jury regarding the applicable law. "[P]articipation by a business entity in a scheme to defraud in no way necessitates a finding that officers were participants in that scheme." *Brown,* 79 F.3d at 1555 n. 9 (quoting *United States v. Toney,* 605 F.2d 200, 208 (5th Cir.1979), *cert. denied,* 444 U.S. 1090, 100 S.Ct. 1055, 62 L.Ed.2d 779 (1980)). Rather, "the evidence must show that each officer, the person, "willfully participated' in the scheme." *Id.* (quoting *United States v. Sawyer,* 799 F.2d 1494, 1502 (11th Cir.1986), *cert. denied,* 479 U.S. 1069, 107 S.Ct. 961, 93 L.Ed.2d 1009 (1987)).

Here, the undisputed evidence is that the Foundation was incorporated by Schlei, Han, and Takahashi, for the sole purpose of selling the counterfeit financial instruments. As a member of a conspiracy to sell forged bank notes, Schlei was responsible for the acts of his coconspirators, if they were in furtherance of the object of the conspiracy, whether or not he had knowledge of criminal conduct that is the natural consequence of the illegal agreement. *See United States v. Alvarez,* 755 F.2d 830, 847 (11th Cir.) ("[E]ach member of the conspiracy is criminally liable for any crime committed by a coconspirator during the course and in furtherance of the conspiracy, unless the crime "did not fall within the scope of the unlawful project, or was merely a part of the ramifications of the plan which could not be reasonably foreseen as a necessary or natural consequence of the

36

unlawful agreement'.") (quoting *Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946)), *cert. denied sub nom. Hernandez v. United States,* 474 U.S. 905, 106 S.Ct. 274, 88 L.Ed.2d 235 (1985). Thus, an instruction that a corporate officer is not liable for the acts of another officer would have misled the jury regarding the liability of a conspirator who forms a corporation to serve as a cover for the illegal activities of the conspirators. The district court did not abuse its discretion in declining to instruct the jury that corporate officers are not liable for the acts of other officers unless they have knowledge or participate in such conduct.

C. *Definition of Security*

The district court instructed the jury that, with respect to the securities fraud charge, the term "security" means:

> [A]ny note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, or in general any interest or instrument commonly known as a "security," or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee for, or warrant or right to subscribe to or purchase, any of the foregoing.
>
> *As used in these instructions, the term "security" includes counterfeit and forged securities and securities that did not exist.*

(emphasis added).

Schlei contends that the highlighted section of the district court's instructions misstates the applicable law. He argues that Congress provided an exhaustive definition of "securities" in 15 U.S.C. § 77b(1). He contends that the district court's expansion of this definition to include "counterfeit and forged securities and securities that did not exist," permitted the jury to convict him of a crime not created by Congress. He maintains that this instruction deprived him of his right to due process. The thrust of his argument is that the securities laws were designed "to prohibit only the sale of genuine securities by fraudulent means."

The Supreme Court has instructed that "[t]he aim [of the Securities Act] is to prevent further exploitation of the public by the sale of unsound, fraudulent, and *worthless* securities through

37

misrepresentation." *United States v. Naftalin,* 441 U.S. 768, 775, 99 S.Ct. 2077, 2083, 60 L.Ed.2d 624 (1979) (quoting S.Rep. No. 73-47, at 1 (1933) (emphasis added)). Schlei's argument was expressly rejected by the Fifth Circuit in *Seeman v. United States,* 90 F.2d 88 (5th Cir.1937). In *Seeman,* the Fifth Circuit reasoned as follows: "It is difficult to imagine any transaction that would be better calculated to deceive and defraud a purchaser than to sell and ship him forged imitations of genuine bonds. The [securities] act is broad enough to cover the transaction charged as a crime in the indictment." *Id.* at 89.

More recently, the Fifth Circuit reiterated this principle in *First Nat'l Bank of Las Vegas, New Mexico v. Estate of Russell,* 657 F.2d 668 (5th Cir. Unit A Sept.1981). "The fraud provisions are not defeated by the fact that a security purportedly traded is nonexistent or fictitious.... A contrary result would encourage rather than curb fraud." *Id.* at 673 n. 16 (quoting 1 A. Bromberg, *Securities Law: Fraud—SEC Rule 10b-5,* § 4.6, at 316 (1977)).

The district court did not abuse its discretion in instructing the jury that counterfeit, forged, and nonexistent securities are included within the definition of a security.

D. *Deliberate Ignorance*

Schlei maintains that the court abused its discretion in instructing the jury on deliberate ignorance. The district court instructed the jury as follows:

> When knowledge of the existence of a particular fact is an essential element of an offense, such knowledge may be established if the defendant is aware of a high probability of its existence, unless he actually believes that it does not exist.

> So, with respect to the issue of the defendant's knowledge in this case, if you find from all the evidence beyond a reasonable doubt *that a defendant committed these offenses deliberately, and consciously tried to avoid learning* that the bonds were false, fraudulent, or counterfeit, in order to be able to say if he or she should be apprehended, that he or she did not know that the bonds were false, fraudulent, or counterfeit, you may treat such deliberate avoidance of positive knowledge as the equivalent of knowledge. In other words, you may find that a defendant acted "knowingly" if you find beyond a reasonable doubt either:

>> *One:* That the defendant actually knew that the bonds were false, fraudulent, or counterfeit; or

>> *Two:* That he or she deliberately closed his or her eyes to what he or she had every reason to believe was the fact.

38

(emphasis added).

A district court should not instruct a jury regarding deliberate ignorance "when the evidence only points to either actual knowledge or no knowledge on the part of the defendant." *United States v. Stone,* 9 F.3d 934, 937 (11th Cir.1993), *cert. denied,* 513 U.S. 833, 115 S.Ct. 111, 130 L.Ed.2d 58 (1994).

> A "deliberate ignorance" instruction is appropriate when the facts ... support the inference that the defendant was aware of a high probability of the existence of the fact in question and purposely contrived to avoid learning all of the facts in order to have a defense in the event of a subsequent prosecution.

*Perez-Tosta,* 36 F.3d at 1564 (quotation omitted).

Here, the evidence demonstrated that Schlei had actual knowledge that the instruments were counterfeit, but chose to disregard that knowledge. Under these circumstances, the district court should not have instructed the jury on deliberate ignorance. *See id.* (concluding that deliberate ignorance instruction was error where evidence established only actual knowledge). This error, however, was harmless because the evidence of actual knowledge presented at trial "strongly supported a finding" that Schlei knew the instruments were counterfeit. *Id.* at 1565. *See also Stone,* 9 F.3d at 937 (concluding error not harmless where the evidence was not "so overwhelming as to compel a guilty verdict.") (quoting *United States v. Rivera,* 944 F.2d 1563, 1572-73 (11th Cir.1991)).

Schlei further asserts that the court's deliberate ignorance instruction was an incorrect statement of the law. He contends that the requisite *mens rea* for the crimes committed required a finding that defendants acted willfully as well as knowingly, and the instruction given permitted the jury to convict Schlei without finding that he acted willfully.

Although Schlei objected to the deliberate ignorance instruction at trial, he did not raise this specific contention before the district court. "In order to preserve an objection to jury instructions for appellate review, a party must object before the jury retires, stating distinctly the specific grounds for the objection." *United States v. Starke,* 62 F.3d 1374, 1380-81 (11th Cir.1995). Because no specific objection was made at trial, we review this claim for plain error. *Id.* For plain

39

error to occur, "[t]here must be an "error' that is "plain' and that "affect[s] substantial rights.' " *United States v. Olano,* 507 U.S. 725, 732, 113 S.Ct. 1770, 1776, 123 L.Ed.2d 508 (1993).

In contrast to the charge given to the jury in the instant matter, the Eleventh Circuit pattern instruction provides that "the Defendant believed that he possessed _____ [a controlled substance] and deliberately and consciously tried to avoid learning that there was _____ [in the package he possessed]." (alterations in original). That portion of the charge challenged by Schlei instructed the jury to find that Schlei committed the offense deliberately, and then consciously tried to avoid learning that the instruments were counterfeit. Had the language employed in the pattern instructions been incorporated in the charge, the district court would have instructed the jury to find that Schlei believed that he possessed counterfeit instruments, and deliberately and consciously avoided knowledge that the instruments were counterfeit.

Schlei's argument that the instruction permitted the jury to substitute conscious avoidance of knowledge for willfulness is not persuasive. The instruction provides an alternative definition for "knowingly." Further, the omission of "deliberate" avoidance from the instruction given is remedied by the instruction's summary of when a defendant can be found to have acted "knowingly." The instruction permitted a finding that the defendant acted knowingly where "*One:* That the defendant actually knew that the bonds were false, fraudulent, or counterfeit; or *Two:* That he or she deliberately closed his or her eyes to what he or she had every reason to believe was the fact." The instruction presented to the jury, therefore, permitted the jury to substitute conscious avoidance for knowingly, but not willfully, and, the summary portion of the instruction required the jury to find either actual knowledge or "deliberate" avoidance. The court's deliberate ignorance instruction did not constitute plain error because it did not affect Schlei's substantial rights.

III

VENUE

Schlei asserts that the Middle District of Florida did not have venue over the conspiracy and the securities fraud charges in the indictment. "[T]erritorial jurisdiction and venue are essential

elements of any offense in the sense that the burden of proof is on the prosecution to prove their existence.... However, venue need only be proved by a preponderance of the evidence as opposed to beyond a reasonable doubt." *United States v. Barnes,* 681 F.2d 717, 722 (quotation omitted), *amended by,* 694 F.2d 233 (11th Cir.1982), *cert. denied sub nom. Riddle v. United States,* 460 U.S. 1046, 103 S.Ct. 1447, 75 L.Ed.2d 802 (1983).

> This court reviews a challenge to venue in the light most favorable to the government and makes all reasonable inferences and credibility choices in favor of the jury verdict when deciding whether the government has proved by a preponderance of the evidence that an offense occurred in the trial district.

*United States v. Smith,* 918 F.2d 1551, 1557 (11th Cir.1990).

A. *The Conspiracy Charge—Count One*

Schlei was convicted of a conspiracy that had as its object the possession and delivery of false and counterfeit foreign bank notes in violation of 18 U.S.C. § 480. Schlei asserts that venue was improper as to this crime because "there was no geographical connection of any kind between any "bank note' conspiracy and the Middle District of Florida on which jurisdiction and venue could be predicated."

Schlei maintains that the jury verdict reflects the jury's determination that he was not a conspirator "with respect to any of the acts or events that took place in Tampa." Schlei maintains that because he had no direct contact with Hill, Ah Loo, Hansberry, Agent Fox, or Agent Sankey, he could only have been found responsible for the Tampa transaction because of his relationship with Takahashi. Schlei contends that because the jury acquitted him of all charges relating to the bond certificates, it necessarily determined that Takahashi and Hill entered a separate conspiracy when they entered into their agreement in September 1991. Because Hill obtained bank note 59155 at the same time he obtained three bond certificates from Takahashi, Schlei asserts that the jury could not have found that Schlei conspired with Hill to sell bank note 59155 because the jury found that he did not conspire to sell any bond certificates in Tampa. Schlei asserts that the "secret" agreement between Takahashi and Hill to sell the financial instruments was the only means of connecting Schlei with the Tampa transaction. He argues that because the jury necessarily

41

determined that Schlei did not participate in the agreement between Hill and Takahashi, the Middle District of Florida did not have venue over the conspiracy to sell the bank notes.[9]

The retainer agreement between Schlei, Han, Hiraki, Takahashi, and Lee, states in pertinent part, that "Norbert A. Schlei agrees to provide such legal services as may be required in relation to the negotiation and cashing of certain checks and other instruments with respect to which his assistance is sought, including but not limited to checks numbered A35261, A35262, A35263, A35264, A35265 and A35266 drawn on the Dai-[I]chi Kangyo Bank." Based on the retainer agreement, the jury may have concluded that Schlei entered a conspiracy to sell the bank notes but not the bond certificates.

The jury's verdict does not support an inference that Schlei no longer was a member of the conspiracy to sell the financial instruments solely because he was unaware that Takahashi had secretly hired Hill to sell bond certificates and bank notes in 1991. Takahashi's conduct was in furtherance of the overall conspiracy to sell bond certificates and bank notes, and, as discussed above, Schlei never withdrew from that conspiracy.

The jury was also presented with evidence that Schlei personally attempted to pass one of the bank notes, only to be informed that the bank note was a forgery. Even after Schlei gained this knowledge in 1985, he signed an agreement in May 1986 to sell Hill & Associates bond certificates and bank notes. Additionally, bank notes were transferred to Hill in agreements entered by the Foundation in 1987, 1988, and 1989. The 1988 and 1989 agreements were entered into after Schlei attended Aoyagi's deposition in Japan.

---

[9]The jury was instructed that to find defendants guilty of a conspiracy "the evidence in the case *must* show beyond a reasonable doubt ... [t]hat one "overt act' in furtherance of the conspiracy took place within the Middle District of Florida which includes Tampa, Florida."

Schlei contends that Hill's possession of bank note 59155 in Tampa was not an overt act[10] sufficient to confer jurisdiction and venue on the Middle District of Florida for conspiring to possess and deliver foreign bank notes with the intent to defraud, because that possession was wholly unrelated to the Tampa transaction and there was no evidence that Hill possessed the instrument with the intent to defraud.

A conspiracy may be prosecuted in the district where it was formed or in any district where an overt act was committed in furtherance of its objects. *Smith,* 918 F.2d at 1557; *Barnes,* 681 F.2d at 722. An overt act "may be that of only a single one of the conspirators and need not be itself a crime." *Braverman v. United States,* 317 U.S. 49, 53, 63 S.Ct. 99, 101, 87 L.Ed. 23 (1942). "[A]n individual conspirator need not participate in the overt act in furtherance of the conspiracy. Once a conspiracy is established, and an individual is linked to that conspiracy, an overt act committed by any conspirator is sufficient." *United States v. Thomas,* 8 F.3d 1552, 1560 n. 21 (11th Cir.1993). Hill's possession of the bank note in Tampa was an overt act sufficient to confer jurisdiction on the Middle District of Florida for the conspiracy to possess or deliver foreign bank notes.

B. *The Securities Fraud Charge—Count Ten*

On September 19, 1994, Schlei filed a motion to strike the 1988 Olson transaction from Count Ten of the indictment. The district court denied the motion. Schlei was convicted of securities fraud as charged in Count Ten of the indictment. We review a district court's denial of a motion to strike for an abuse of discretion. *United States v. Huppert,* 917 F.2d 507, 511 (11th Cir.1990).

Count Ten charged defendants as follows:

---

[10]Although the Government presented evidence of Hill's possession of the bank note at trial, the Government did not include this as an overt act in the indictment. Nonetheless, Schlei had constitutionally sufficient notice of the charges against him. "An indictment charging a continuing criminal enterprise is sufficient for constitutional purposes if it articulates in statutory language the elements of the violation.... The government need not provide defendant with all the overt acts that might be introduced at trial." *United States v. Reed,* 980 F.2d 1568, 1578 n. 7 (11th Cir.) (quotation omitted), *cert. denied sub nom. Lady v. United States,* 509 U.S. 932, 113 S.Ct. 3063, 125 L.Ed.2d 745 (1993).

From in or about April 1986, up to and continuously there after up to and including January 31, 1992, in the Middle District of Florida and elsewhere,

B.J. BRAVENDER AH LOO,

ROGER A. HILL,

BRUCE HANSBERRY,

NORBERT SCHLEI

and

TOSHIO TAKAHASHI

the defendants herein, aiding and abetting each other, did knowingly, willfully, and unlawfully, both directly and indirectly, in the offer or sale of securities, that is, counterfeit Japanese government Series 57 M-Bonds, by the use of, the means and instruments of transportation and communication in interstate commerce: (1) employed a scheme and artifice to defraud, and obtain money and property by participating in activities designed to promote a market for the sale of counterfeit Japanese government Series 57 M-Bonds and create the impression that the counterfeit Japanese government Series 57 M-Bonds were genuine and authentic; (2) obtained money and property by means of untrue statements of material fact and omissions to state material facts necessary in order to make statements made, in the light of the circumstances under which they were made, not misleading; and (3) engaged in transactions, practices and courses of business which would and did operate as a fraud and deceit upon purchasers, as more fully described below.

1. In or about April 1985, defendant TOSHIO TAKAHASHI obtained counterfeit Japanese government Series 57 M-Bonds.

2. In or about March 1986, defendant NORBERT SCHLEI was advised by the Japanese Ministry of Finance that the Japanese government Series 57 M-Bonds were counterfeit and worthless.

3. In or about July 31, 1986, C.K. Lee was arrested in Las Vegas, Nevada for selling a counterfeit Japanese government Series 57 M-Bond.

4. On or about December 19, 1986, the defendants, NORBERT SCHLEI and TOSHIO TAKAHASHI, and Sam Han formed the Japan America Management Company for the purpose of managing and investing the assets and proceeds realized from the sale of counterfeit Japanese government Series 57 M-bonds.

5. In or about July 1988, defendant, NORBERT SCHLEI attended depositions in Japan where witnesses testified that the Japanese government Series 57 M-Bonds were counterfeit and worthless.

6. In or about February 1988, defendants NORBERT SCHLEI and TOSHIO TAKAHASHI transferred a counterfeit Japanese government Series 57 M-Bond to defendant B.J. BRAVENDER AH LOO for sale to Howard Olson.

7. In or about March 18, 1989, defendant NORBERT SCHLEI advised defendant ROGER HILL that the Japanese government Series 57 M-Bonds were in dispute.

8. From in or about October 1991 to on or about January 18, 1992, defendants B.J. BRAVENDER AH LOO, ROGER HILL and BRUCE HANSBERRY offered for sale and sold a counterfeit Japanese government Series 57 M-Bond to undercover federal agents.

9. During the attempted sales of these counterfeit Japanese government Series 57 M-Bonds outlined above, the defendants failed to disclose to potential buyers that the Japanese Ministry of Finance had advised defendant, NORBERT SCHLEI, that the Japanese government Series 57 M-Bonds were counterfeit; that C.K. Lee had been arrested for selling a counterfeit Japanese government Series 57 M-Bond; and that during depositions in Japan witnesses testified that the Japanese government Series 57 M-Bonds were counterfeit and worthless.

In violation of Title 15, United States Code, Sections 77q and 77x and Title 18, United States Code, Section 2.

Schlei argues that by alleging two separate transactions in the securities fraud charge, the Government permitted the jury to convict him based solely on the evidence of the Olson transaction. It is undisputed that the district court had no venue over the Olson transaction. The Government argues that Schlei was "not entitled to a new trial on the ground that the jury's verdict *may* have been a legally inadequate ground, *i.e.,* the Olson transaction.... The Olson transaction was part of the ongoing securities fraud offense, and, therefore, it properly was alleged as part of the Middle District of Florida Indictment." Schlei responds that "[s]eparate transactions constitute separate offenses under the statute even if they are part of the same scheme to defraud. As a result, each transaction must be charged in a separate count." Schlei maintains that because the securities fraud count charged two offenses, the jury may not have been in unanimous agreement regarding whether Schlei participated in the Tampa transaction as a coconspirator or an aider and abettor.

Although somewhat convoluted, this argument boils down to an assertion that the securities fraud count was duplicitous, and that the district court abused its discretion when it denied Schlei's motion to strike the Olson transaction to correct this defect.

A count in an indictment is duplicitous if it charges two or more "separate and distinct" offenses. *United States v. Burton,* 871 F.2d 1566, 1573 (11th Cir.1989). A duplicitous count poses three dangers: "(1) A jury may convict a defendant without unanimously agreeing on the same

45

offense; (2) A defendant may be prejudiced in a subsequent double jeopardy defense; and (3) A court may have difficulty determining the admissibility of evidence." *United States v. Wiles,* 102 F.3d 1043, 1061 (10th Cir.1996) (finding no duplicity where the indictment merely alleged multiple means or methods of committing a single offense), *modified,* 106 F.3d 1516 (10th Cir.1997), *petition for cert. filed,* 65 U.S.L.W. 3632 (U.S. Mar. 10, 1997) (No. 96-1430). Under this analysis, the key issue to be determined is what conduct constitutes a single offense.

The securities fraud statute provides:

(a) It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any transaction, practice, or course of business which operates or would operate as fraud or deceit upon the purchaser.

15 U.S.C. § 77q,

In determining the parameters of an offense, we must look to congressional intent. "It is Congress, and not the prosecution, which establishes and defines offenses." *Sanabria v. United States,* 437 U.S. 54, 69, 98 S.Ct. 2170, 2181, 57 L.Ed.2d 43 (1978). "[O]nce Congress has defined a statutory offense by its prescription of the "allowable unit of prosecution,' that prescription determines the scope of protection afforded by a prior conviction or acquittal." *Id.* at 69-70, 98 S.Ct. at 2181-82 (citations omitted).

The former Fifth Circuit previously held that each fraudulent offer or sale of any security by the use of the mails in violation of section 77q(a) is a separate offense. In *Sanders v. United States,* 415 F.2d 621 (5th Cir.1969), *cert. denied,* 397 U.S. 976, 90 S.Ct. 1096, 25 L.Ed.2d 271 (1970), the defendant was convicted for conspiracy under section 371 and multiple counts of mail fraud under 18 U.S.C. § 1341 and securities fraud under section 77q(a). *Id.* at 623. The district court sentenced him to consecutive sentences on some of these counts. *Id.* at 626. On appeal, the defendant argued

that he should have been subjected to only one count because all the counts involved "essentially the same evidence." *Id.* In rejecting that argument, the court stated: "It is settled that each separate use of the mails in the execution of a scheme to defraud constitutes a separate offense." *Id.* The court further explained:

> Each of these securities fraud counts refers to a separate offer and sale of the securities described therein to certain named individuals and alleges one specific use of the mails or instrumentality of commerce thus setting forth a separate and complete fraudulent transaction.... [W]e agree with the court below that the proper construction of 15 U.S.C. § 77q(a) is that each fraudulent offer or sale of any security accompanied by mailing or use of any means or instruments of transportation or communication in interstate commerce is a separate crime.

*Id.*

In *United States v. Ashdown,* 509 F.2d 793 (5th Cir.), *cert. denied,* 423 U.S. 829, 96 S.Ct. 48, 46 L.Ed.2d 47 (1975), the defendants, who were also convicted on multiple counts under sections 77q(a) and 1341, argued that only one crime was committed because only one conspiracy was charged. *Id.* at 800. In affirming the judgment of conviction, the former Fifth Circuit stated: "It avails defendants nothing that the same scheme is incorporated in each count; they were convicted of ten separate offenses based on ten different *transactions.*" *Id.* (citing *Sanders,* 415 F.2d at 626) (emphasis added).

In *United States v. Langford,* 946 F.2d 798 (11th Cir.1991), *cert. denied,* 503 U.S. 960, 112 S.Ct. 1562, 118 L.Ed.2d 209 (1992), this court analyzed the "parallel language" in section 78j(b) and recognized that Congress intended to confine the section's scope "to transactions effected by the use of the mails, the instrumentalities of interstate commerce, and the facilities of a national securities exchange." *Id.* at 803 n. 20 (quoting S.Rep. No. 73-792, at 18 (1934)). In light of this intent, this court held that "[t]o avoid the vices of multiplicity in securities fraud cases, each count of the indictment must be based on a separate purchase or sale of securities and each count must specify a false statement of material fact—not a full-blown scheme to defraud—in connection with that purchase or sale." *Id.* at 804. *Langford* involved a violation of section 78j(b). The same reasoning, however, applies to a violation of section 77q(a). *Id.* at 803-04 n. 21 ("Although this circuit has not

47

yet determined whether the units of prosecution under 15 U.S.C. § 78(j)b, Rule 10b-5, and 15 U.S.C. § 77q(a) are the same, we see no reason to interpret the sections differently in this respect—the relevant language of the sections is extremely similar—hence, congressional intent likely was the same under both statutes.").

The rationale underlying *Sanders, Ashdown,* and *Langford* leads us to conclude that the chargeable offense under section 77q(a) is each separate offer or sale of a security in connection with an instrumentality of interstate commerce. Our holding is consistent with the rule adopted in other circuits. *See United States v. Waldman,* 579 F.2d 649, 654 (1st Cir.1978) ("We agree with every other circuit that has faced the question that the appropriate units of prosecution under 77q(a) are separate transactions accompanied by use of the mails."); *United States v. Phillips,* 726 F.2d 417, 419 n. 6 (8th Cir.1984) ("It is well-established that under 15 U.S.C. § 77q(a) *each* fraudulent offer or sale of a security accompanied by the use of the mail or any means or instruments of interstate transportation or communication is a separate offense."); *United States v. Dioguardi,* 492 F.2d 70, 83 (2d Cir.) ("[E]ach transaction in a securities fraud case constitutes a separate offense."), *cert. denied,* 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 112 (1974). *See also United States v. MacKay,* 491 F.2d 616, 623-24 (10th Cir.1973) (recognizing that each separate use of the mails is a separate offense under the mail fraud statute and noting that "the repeated violation of the Securities Act is subject to the same doctrine"), *cert. denied,* 416 U.S. 972, 94 S.Ct. 1996, 40 L.Ed.2d 560 (1974).

All of the cases discussed above address the offense in the context of either a multiplicity claim or a double jeopardy claim. Thus, although each fraudulent offer or sale of any security by the use of the mails is a separate offense that *may* be charged in separate counts, the question we must decide is whether each offense *must* be charged in separate counts. We hold that under the facts of this case, where one of the charged offenses provides an improper basis for prosecution in the district, and no unanimity charge was given, a count containing two securities offenses is duplicitous.

48

In *Bins v. United States,* 331 F.2d 390 (5th Cir.), *cert. denied,* 379 U.S. 880, 85 S.Ct. 149, 13 L.Ed.2d 87 (1964), the former Fifth Circuit concluded that because Rule 8(a), of the Federal Rules of Criminal Procedure, requires that each offense be stated in a separate count, a count that charged two violations of the same statute was duplicitous.

> Whether a continuous transaction results in the commission of but a single offense or separate offenses is not dependent on the number of unlawful motives in the mind of the accused, but is determined by whether separate and distinct prohibited acts, made punishable by law, have been committed.... [E]ach [crime] should be alleged in a separate and distinct count of the indictment.

*Id.* at 393. Several circuits have rejected the *Bins* analysis, *see, e.g., United States v. Aracri,* 968 F.2d 1512, 1518 (2d Cir.1992) ("We have declined to accept the law of the Fifth Circuit "that any acts capable of being charged as separate offenses must be alleged in separate counts.' ") (quoting *United States v. Margiotta,* 646 F.2d 729, 733 (2d Cir.1981), *cert. denied,* 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983)); *United States v. Canas,* 595 F.2d 73, 78 (1st Cir.1979) ("Whether or not this case is factually distinguishable from *Bins,* we find merit in the Government's position.... Other circuits have not adopted the ... approach of *Bins.*"). The Eleventh Circuit, however, has adhered to the *Bins* court's analysis. *See United States v. Davis,* 730 F.2d 669, 672 (11th Cir.1984) ("Although the rationale of *Canas* may be tempting, we are bound by the decision of the former Fifth Circuit Court of Appeals in *Bins,* a case cited as contrary authority by the *Canas* court.").

Because the Olson transaction and the Tampa transaction are two distinct offenses, "each should [have been] alleged in a separate and distinct count of the indictment." *Bins,* 331 F.2d at 393. The failure to do so creates a venue problem.

"The Constitution requires that the trial shall be held in the state and district wherein the crime was committed." *Ashdown,* 509 F.2d at 797. *See also* Fed.R.Crim.P. 18 ("[T]he prosecution shall be had in a district in which the offense was committed.") Venue must exist for each offense charged. *United States v. Davis,* 666 F.2d 195, 198 (5th Cir. Unit B 1982)[11] ("Venue may properly

---

[11]Decisions rendered by Unit B panels of the former Fifth Circuit are binding precedent on this court. *Stein v. Reynolds Securities, Inc.,* 667 F.2d 33, 34 (11th Cir.1982).

be laid in one district with respect to one count of an indictment, but still be improper with respect to the other counts."). The Olson transaction occurred in North Dakota, not Florida. Thus, viewing the evidence in the light most favorable to the Government, and drawing all reasonable inferences and credibility choices in favor of the jury verdict, the Government has not shown by a preponderance of the evidence that any part of the Olson transaction occurred in the Middle District of Florida. Accordingly, the Middle District of Florida was not the proper venue for prosecution of the Olson transaction. The district court abused its discretion when it denied Schlei's request to strike the Olson transaction from Count Ten.

As noted above, we cannot determine from this record whether the jury unanimously concluded that Schlei was guilty of the Tampa transaction either as an aider or abettor or as a conspirator. The fact that the jury found that Schlei did not conspire with others to sell the fraudulent bond certificates adds to our uncertainty concerning the jury's verdict on Count Ten. The jury may have concluded that Schlei was guilty of Count Ten because he was liable for the acts of his coconspirators in Tampa, Florida that were the natural consequence of the conspiracy to sell the bank notes. On the other hand, the jury may have concluded unanimously that Schlei was guilty of the Olson transaction, but did not reach a unanimous verdict regarding the Tampa transaction.

The district court's failure to strike the Olson transaction from Count Ten cannot be deemed harmless. The absence of a unanimity instruction with respect to the two transactions created the risk that the jury found Schlei guilty without unanimously agreeing upon the transaction that formed the basis for the conviction. Further, the jury may have convicted Schlei based upon a transaction that could not be tried in the Middle District of Florida. Thus, Schlei's conviction on Count Ten must be vacated.

IV

DISCOVERY AND EVIDENTIARY RULINGS

A. *Admission of Coconspirators' Post-Arrest Documents and Statements*

Schlei contends that the district court erred in admitting third-party documents seized from codefendants after their arrest. "A district court's ruling on the admissibility of evidence is reviewed for abuse of discretion." *Joiner v. General Elec. Co.,* 78 F.3d 524, 529 (11th Cir.1996), *cert. granted,* --- U.S. ----, 117 S.Ct. 1243, 137 L.Ed.2d 325 (1997).

The district court admitted four documents seized from Hill and Hansberry following their arrests. The court held that these documents were admissible as statements of a coconspirator pursuant to Rule 801(d)(2)(E) of the Federal Rules of Evidence.

To lay a foundation for the admission of a coconspirator's statement, "the government must establish by a preponderance of the evidence: (1) that a conspiracy existed, (2) that the defendant and the declarant were members of the conspiracy, and (3) that the statement was made during the course and in furtherance of the conspiracy." *United States v. Van Hemelryck,* 945 F.2d 1493, 1497-98 (11th Cir.1991). Here, the record shows that the statements in the four documents were made by persons who were not coconspirators.[12] Therefore, the court abused its discretion in admitting them pursuant to Rule 801(d)(2)(E).

We must now determine whether the admission of these statements was prejudicial. "Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded." Fed.R.Crim.P. 52(a). "[E]videntiary and other non-constitutional errors do not constitute grounds for reversal unless there is a reasonable likelihood that they affected the defendant's substantial rights; where an error had no substantial influence on the outcome, and sufficient evidence uninfected by error supports the verdict, reversal is not warranted." *United States v. Hawkins,* 905 F.2d 1489, 1493 (11th Cir.1990), *cert. denied,* 498 U.S. 1038, 111 S.Ct. 707, 112 L.Ed.2d 696 (1991).

---

[12]The four documents are: 1) a two-sided photocopy with an article, written by Bob Riemke, regarding money laundering on one side and an unsigned disclosure form letter from Hill & Associates on the other side; 2) a fax to Blomfield from Yoneda warning him that the bond certificates are often used in fraudulent practices; 3) a letter to Blomfield from Terence Mackinnon asking whether bond A 1304 was one of the bonds inspected by the FBI; and 4) a fax to Bruno C. Picolin from E.F. Einhorn warning him not to be involved with the sale of the bond certificates.

These documents were admitted to prove that Schlei had knowledge that the bond certificates were counterfeit. The Government introduced sufficient evidence unaffected by error that demonstrated that Schlei knew the bond certificates and bank notes were not genuine. The record shows that Schlei had heard Aoyagi swear under oath that she participated in a conspiracy to print and distribute forged bond certificates and bank notes. He was also aware that Lee had been indicted for attempting to sell the forged bond certificates. In addition, the record shows that Schlei was aware that the FBI had warned Olson that the bond certificates were forgeries. Furthermore, Schlei had presented a bank note for payment. The bank refused payment because the bank note was not genuine. The four documents merely provided cumulative information regarding Schlei's actual knowledge that the bond certificates and bank notes were worthless. For that reason, the district court's erroneous admission of the four documents was harmless error because it had no substantial influence on the outcome of this case.

B. *Admission of Testimony Regarding the Aoyagi Deposition*

Schlei contends that the district court abused its discretion when it admitted evidence regarding Aoyagi's testimony at her deposition in Japan. Stein, Green, and FBI Special Agent Michael Schulstad testified that Schlei was present during Aoyagi's testimony and heard her statement that the bond certificates and bank notes involved in the Lee case were forged. In addition, both Stein and Green testified that Schlei admitted, after hearing Aoyagi testify, that the bond certificates could not be real.

Schlei first contends that the evidence regarding Aoyagi's deposition testimony was inadmissible because her statements were offered for the truth of the matter asserted concerning a material issue in this case.

Rule 801(c) of the Federal Rules of Evidence defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed.R.Evid. 801(c). The record shows that the Government did not offer evidence of Aoyagi's deposition testimony for the truth of the matter asserted. Instead, it was

offered to demonstrate Schlei's state of mind regarding whether he believed the financial instruments were valid. The district court instructed the jury on several occasions that it could not consider Aoyagi's statements for the truth of the matter asserted. The jury was admonished that this evidence was offered solely for the purpose of demonstrating Schlei's state of mind.

Schlei also asserts that even if the testimony was admissible it should have been excluded as unduly prejudicial. Rule 403 of the Federal Rules of Evidence provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." This court has opined that "[t]he major function of [Rule 403] is limited to excluding matter[s] of scant or cumulative probative force, dragged in by the heels for the sake of [their] prejudicial effect[s]." *United States v. Veltmann,* 6 F.3d 1483, 1500 (11th Cir.1993) (quoting *United States v. McRae,* 593 F.2d 700, 707 (5th Cir.1979)).

The prejudicial effect of Aoyagi's testimony did not substantially outweigh its probative force. No other evidence directly established that after hearing Aoyagi's deposition testimony, Schlei stated he was persuaded that the financial instruments were counterfeit.

Finally, Schlei asserts that the denial of an opportunity to depose Aoyagi violated his rights under the Confrontation Clause. Schlei had the opportunity to cross-examine each of the witnesses who testified about Aoyagi's statements. As noted above, her deposition testimony was admitted for the purpose of showing Schlei's reaction to it, and not for its truth. Thus, Schlei was not deprived of his rights under the Confrontation Clause. *See Tennessee v. Street,* 471 U.S. 409, 413, 105 S.Ct. 2078, 2081, 85 L.Ed.2d 425 (1985) (holding that the Confrontation Clause was not violated when an out-of-court statement made by another party was used by a witness on the stand for a purpose other than to assert its truth because the respondent was permitted to cross-examine the witness and the court gave the jury limiting instructions).

C. *Motion to Compel Evidence from the CIA*

53

Schlei claims that the district court abused its discretion in denying his emergency motion for production of documents subpoenaed from the CIA, Department of State, and National Archives and Record Administration. The enforcement of subpoenas is committed to the sound discretion of the district court. *United States v. Nixon,* 418 U.S. 683, 702, 94 S.Ct. 3090, 3104, 41 L.Ed.2d 1039 (1974).

On October 6, 1994, after trial in this case began, an article appeared in the *New York Times,* which stated that the CIA "gave money to the Liberal Democratic Party and its members in the 1950's and the 1960's" according to "retired intelligence officials and former diplomats." Following publication of the article, Schlei subpoenaed the following:

> All reports, documents, and materials, whether classified or not, describing, associated with, connected to, or involved in any manner payments or remuneration of any kind, including covert payments, made by the United States Government or any agent or agency of the United States Government to:
>
> > (a) employees or officials of the Government of Japan;
> >
> > (b) any political party in Japan, including but not limited to the Liberal Democratic Party;  or
> >
> > (c) any representative, officer, or member of any political party in Japan,
>
> during the period from 1945 to the present, including but not limited to those payments described in the attached article from the Sunday, October 9, 1994, edition of the *New York Times.*

Immediately prior to the issuance of the subpoenas, Schlei requested that the district court require the agencies to provide these documents for immediate inspection. After the subpoenas had been served, and the agencies had refused to search for the requested documents until ordered by the court to do so, Schlei filed a motion to compel compliance. After the district court heard oral argument on this issue, the court denied the motion to compel compliance on the ground that there was no evidence in the record to substantiate the existence of a secret fund.

After the *New York Times* article appeared, the prosecution made inquiry of various government agencies to ensure that the government did not possess material required to be turned over to the defense under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

54

In an *ex parte in camera* conference, the Government represented to the district court that it had contacted the CIA, Secret Service, National Archives, which has the files from the Office of Strategic Services and the Central Intelligence Group, and the State Department and had determined that these agencies did not possess any *Brady* material. The government detailed the searches that had been conducted. The government searched hundreds of files of CIA paper records dating back to 1948 in search of any documents that might indicate that payments made by the CIA to either the Japanese government, the Liberal Democratic Party, or individual party members. They also conducted computer searches for Marquat Fund, Marquet Fund, Marqeat Fund, MacArthur Fund, and fund generally. The district court then required the Government to search for all names and relevant information contained in the embassy letter and the *New York Times* article, including all names, information regarding "spoils of war," and the ink used by the Japanese government in printing bonds. In fact, when Ah Loo testified regarding a particular book that contained information about General Marquat, the court directed the CIA to search for a connection. The court subsequently ordered numerous *in camera ex parte* proceedings involving the prosecutors and CIA representative, and directed many searches to cover every conceivable connection to Schlei's recitation of the history of the M Fund. We have reviewed the sealed record of the court's *in camera* proceedings. The search of the records of the CIA, the Secret Service, and the National Archives did not disclose any relevant or material documents or information that substantiated the report in the *New York Times* that the CIA gave money to employees or officials of the Japanese government, or any political party in Japan.

In his motion for a new trial, Schlei argued that the district court abused its discretion in denying his request to enforce the subpoenas. The district court denied the motion for a new trial. Relying in part on *United States v. Valenzuela-Bernal,* 458 U.S. 858, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982), the district court stated that Schlei had failed to "demonstrate that the requested information would be relevant[,] material and vital to his defense."

55

Schlei first argues that the district court's reliance on *Valenzuela-Bernal* was misplaced because the facts of that case are distinguishable. Schlei also contends that by requiring that the evidence sought be "vital" to his defense, the district court failed to follow the standard set forth in *Valenzuela-Bernal.*

In *Valenzuela-Bernal,* the defendant claimed that he was deprived of his constitutional right to compulsory process because he had not had the opportunity to interview two witnesses deported by the Government. The Court determined that sanctions could be imposed on the Government for deporting a witness "only if the criminal defendant makes a plausible showing that the testimony of the deported witnesses would have been material and favorable to his defense, in ways not merely cumulative to the testimony of available witnesses." *Id.* at 873, 102 S.Ct. at 3449. The Court also stated that "[i]n adopting this standard, we express no opinion on the showing which a criminal defendant must make in order to obtain compulsory process for securing the attendance at his criminal trial of witnesses within the United States." *Id.* at 873 n. 9, 102 S.Ct. at 3449 n. 9.

The Court pointed out, however, that pursuant to its prior decisions, a defendant "must at least make some plausible showing of how [the] testimony [sought] would have been both material and favorable to his defense." *Id.* at 867, 102 S.Ct. at 3446.

Schlei has failed to demonstrate that the CIA and other government agencies possessed information regarding potential witnesses or government documents that would provide evidence that would be relevant and material to his defense that the financial instruments had been issued by the government of Japan and the Dai-Ichi Kangyo Bank. Because Schlei failed to make the foundational showing that the evidence sought would be material and favorable to his defense, we need not decide whether the court erred in stating that the requested material must also be vital to the defense. The district court did not deprive Schlei of his right to compulsory process.

D. *Motion to Depose Witnesses in Japan*

Schlei argues that the district court abused its discretion in denying him leave to take depositions of Japanese nationals in Japan. A district court's denial of a party's motion to take a

56

deposition is reviewed for abuse of discretion. *United States v. Ramos,* 45 F.3d 1519, 1522 (11th

Cir.1995).

Rule 15(a), of the Federal Rules of Criminal Procedure provides:

Whenever due to exceptional circumstances of the case it is in the interest of justice that the testimony of a prospective witness of a party be taken and preserved for use at trial, the court may upon motion of such party and notice to the parties order that testimony of such witness be taken by deposition and that any designated book, paper, document, record, recording, or other material not privileged, be produced at the same time and place.

Fed.R.Crim.P. 15(a).

The record shows that Schlei did not file a motion to depose witnesses in Japan, nor did he

join in Hill's motion to do so. Accordingly, Schlei has failed to preserve that issue for appellate

review.

V

SEVERANCE

Schlei maintains that the district court erred in denying his motion for severance. He argues

that severance was required because the Government alleged a single conspiracy when there were

actually multiple conspiracies. He also argues that the district court should have granted severance

"pursuant to Rule 14 [of the Federal Rules of Criminal Procedure] because he was prejudiced by the

enormous disparity in the evidence admissible against him compared to the other defendants." We

must review the denial of a motion for severance for abuse of discretion. *United States v. Adams,*

1 F.3d 1566, 1578 (11th Cir.1993), *cert. denied,* 510 U.S. 1198, 114 S.Ct. 1310, 127 L.Ed.2d 660

(1994).

Rule 8(b) of the Federal Rules of Criminal Procedure permits the Government to join two

or more defendants "in the same indictment or information if they are alleged to have participated

in the same act or transaction or in the same series of acts or transactions constituting an offense or

offenses." Fed.R.Crim.P. 8(b).

If joinder of defendants proves to be prejudicial, Rule 14 permits a defendant to move for a severance.[13] The burden is on the defendant to "demonstrate that a joint trial will result in specific and compelling prejudice to the conduct of his defense." *United States v. Walker,* 720 F.2d 1527, 1533 (11th Cir.1983) (citation omitted), *cert. denied sub nom. Gustin v. United States,* 465 U.S. 1108, 104 S.Ct. 1614, 80 L.Ed.2d 143 (1984). A defendant can satisfy this requirement by showing that the jury was unable to sift through the evidence and "make an individualized determination as to each defendant." *United States v. Saget,* 991 F.2d 702, 707 (11th Cir.) (citation omitted), *cert. denied,* 510 U.S. 950, 114 S.Ct. 396, 126 L.Ed.2d 344 (1993). It is the district court's duty to "balance the prejudice that a defendant may suffer from a joint trial, against the public's interest in judicial economy and efficiency." *United States v. Cross,* 928 F.2d 1030, 1037 (11th Cir.), *cert. denied,* 502 U.S. 985, 112 S.Ct. 594, 116 L.Ed.2d 618 (1991).

The defendant's burden remains the same when seeking reversal of the denial of a motion to sever on appeal. *Saget,* 991 F.2d at 707. "This court is reluctant to reverse a district court's denial of severance, particularly in conspiracy cases, as generally persons who are charged together should also be tried together." *United States v. Knowles,* 66 F.3d 1146, 1158 (11th Cir.1995) (quotation omitted), *cert. denied sub nom. Wright v. United States,* --- U.S. ----, 116 S.Ct. 1449, 134 L.Ed.2d 568 (1996).

Schlei has not met his burden. As discussed above, the Government produced sufficient evidence to demonstrate that Schlei was a member of a single overall conspiracy from which he never withdrew. Schlei also has not identified any specific prejudice he suffered as a result of the joint trial. The mere fact that there may be an "enormous disparity in the evidence admissible against him compared to the other defendants" is not a sufficient basis for reversal. "A defendant does not suffer compelling prejudice, sufficient to mandate a severance, simply because much of the evidence at trial is applicable only to co-defendants." *United States v. Smith,* 918 F.2d 1501, 1510

---

[13]Rule 14 provides in pertinent part: "If it appears that a defendant ... is prejudiced by a joinder of offenses or of defendants in an indictment ... the court may ... grant a severance of defendants."

(11th Cir.1990), *cert. denied sub nom. Hicks v. United States,* 502 U.S. 849, 112 S.Ct. 151, 116 L.Ed.2d 117 (1991). The district court avoided any potential prejudice by instructing the jury that "[e]ach offense, and the evidence pertaining to it, should be considered separately" and that "each defendant should be considered separately and individually." It is readily apparent that the jury followed these instructions as it acquitted Schlei on eight counts. Reedy was acquitted on all counts. The verdict demonstrates the jury's ability to sift through the evidence and make individualized determinations as to each defendant.

The district court did not abuse its discretion when it denied Schlei's motion for severance.

VI

SPEEDY TRIAL

A. *The Speedy Trial Act*

Schlei asserts that the district court erred in denying his motions to dismiss the indictment for violation of the Speedy Trial Act, 18 U.S.C. §§ 3161-3174. Schlei maintains that the court improperly excluded 179 days from the speedy trial limitation. We review the district court's construction and interpretation of the Speedy Trial Act *de novo. United States v. Twitty,* 107 F.3d 1482, 1488 (11th Cir.1997). The district court's factual determination as to what constitutes excludable time under the Speedy Trial Act is reviewed for clear error. *United States v. McCutcheon,* 86 F.3d 187, 190 (11th Cir.1996).

Pursuant to the Speedy Trial Act, a defendant must be tried within seventy days from the filing of his indictment or information, or from the date on which he first appears before a judge or magistrate, whichever occurs later. *See* 18 U.S.C. § 3161(c)(1). Section 3161(h) sets forth certain periods of delay that are excludable from the calculation of the seventy-day limit. 18 U.S.C. § 3161(h). In a case involving multiple defendants, the seventy-day time limit begins to run when the last codefendant is indicted or arraigned. 18 U.S.C. § 3161(h)(7). *See also Henderson v. United States,* 476 U.S. 321, 323, n. 2, 106 S.Ct. 1871, 1873 n. 2, 90 L.Ed.2d 299 (1986) (interpreting 18

59

U.S.C. § 3161(h)(7)). The date of indictment or arraignment is not counted as one of the seventy days. *Vasser,* 916 F.2d at 627.

Schlei's speedy trial clock started running on October 15, 1992.[14] Assuming Schlei's calculations are correct, only nine days had accrued on the speedy trial clock during the period of October 15, 1992 through September 10, 1993. During this period, Schlei and his codefendants made numerous pretrial motions that tolled the seventy-day time limit.[15]

Schlei contends, however, that the district court erroneously excluded fifty-nine days for the period of September 11, 1993 through November 7, 1993, and forty-nine days for the period of December 7, 1993 through January 23, 1994. Schlei argues that these periods of delay were the result of the Government's lack of diligence in securing a timely resolution to the defendants' safe passage to Japan to be present during the taking of depositions by the Government.

On November 23, 1992, the Government filed a motion to depose key witnesses located in Japan, and for continuance of the trial date until the depositions were completed and transcribed.

On January 6, 1993, the district court referred the matter to a magistrate judge to determine whether the foreign depositions were necessary. After conducting an evidentiary hearing, the magistrate judge issued a report in which it was recommended that the Government's motion be denied without prejudice. The magistrate judge found that the Government had failed to make an adequate showing that the Japanese witnesses were unavailable for trial and that their testimony was material.

---

[14]Schlei was arraigned on October 9, 1992. The last codefendants were arraigned on October 14, 1992.

[15]A pretrial motion relating to one defendant tolls the speedy trial clock for all codefendants. *Twitty,* 107 F.3d at 1488, 18 U.S.C. § 3161(h)(7). Schlei contends that his statutory right to a speedy trial was impaired by joinder with his codefendants, all of whom waived their right to a speedy trial. In adopting subsection (h)(7), however, Congress specifically determined that the efficiency and economy of multi-defendant criminal trials far outweigh the granting of a severance where the reason was simply the passage of time. *United States v. Varella,* 692 F.2d 1352, 1359 (11th Cir.1982), *cert. denied,* 464 U.S. 838, 104 S.Ct. 127, 78 L.Ed.2d 124 (1983). Thus, reasonable delays resulting from his codefendants motions will also be excludable in determining the validity of Schlei's challenge. *Id.*

60

On February 19, 1993, the Government filed a motion to reopen the evidentiary hearing for a stay of the magistrate judge's recommendation and report. Alternatively, the Government recommended that the district court grant the request to depose witnesses in Japan. On February 25, 1993, the district court granted the Government's motion over Schlei's opposition, and referred the motion to the magistrate judge for a report and recommendation. On March 30, 1993, the magistrate judge conducted an evidentiary hearing. The Government introduced additional evidence concerning the materiality of the witnesses and its efforts to obtain the witnesses' presence at trial. The magistrate judge issued an amended report and recommendation on May 5, 1997. The magistrate judge recommended that the Government be permitted to take depositions in Japan subject to certain requirements, including a guarantee that Schlei would be granted safe passage to attend the depositions in Japan.[16]

On June 10, 1993, the district court adopted the magistrate judge's amended report and recommendation. After holding an evidentiary hearing on the procedures to be used in obtaining the depositions, the magistrate judge issued another report and recommendation on July 2, 1993. One of the recommendations was that the Government be required to obtain written verification of safe passage for Schlei from a Japanese official who has the authority to guarantee such passage.

On August 16, 1993, the Government filed a letter dated August 13, 1993 from the Japanese embassy. The letter stated that while prosecution of Schlei had not been initiated, the Government of Japan would not guarantee his safe passage. On August 17, 1993, the district court adopted the magistrate judge's July 2, 1993 report and recommendation. Accordingly, before the deposition could be conducted, the Government was ordered to obtain written verification of safe passage for Schlei from the government of Japan. The district court ordered that the depositions be conducted between September 13 through September 17, 1993.

---

[16]The magistrate judge recommended that the Government guarantee Schlei's safe passage to Japan in order to safeguard his right to confront the witnesses against him. The Government assured the court that it could secure a commitment from the Government of Japan that Schlei would not be arrested.

In response to the court's August 17, 1993 order, the Government filed an emergency motion in which it requested that the district court issue an order directing that any party choosing not to attend the depositions, to avoid arrest, should participate in the deposition proceedings telephonically. On August 27, 1993, the Government filed a motion for a continuance on the scheduled depositions. Schlei did not oppose this motion. On September 9, 1993, Schlei filed an opposition to the Government's emergency motion to modify the court's order requiring safe passage.

On September 10, 1993, the district court granted an indefinite continuance to enable the Government to pursue the safe passage issue. The court deferred ruling on the Government's emergency motion until the Government had further investigated the government of Japan's willingness to guarantee safe passage to Schlei. On April 4, 1994, the Government filed a motion to withdraw its request to take depositions in Japan. The court denied this request as moot on October 4, 1994, the first day of trial.

We review an order granting a continuance for abuse of discretion. *United States v. Vasser,* 916 F.2d 624, 627 (11th Cir.1990), *cert. denied,* 500 U.S. 907, 111 S.Ct. 1688, 114 L.Ed.2d 82 (1991). Pursuant to 18 U.S.C. § 3161(h)(9), a district court has the authority to grant a continuance of up to one year to allow the government to obtain evidence located in a foreign country. The district court did not abuse its discretion when it granted the Government's unopposed motion for a continuance in order to obtain the deposition testimony in Japan.

Pursuant to section 3161(h)(9), the time that the continuance remains in effect tolls the speedy trial clock. Thus, the periods from September 11, 1993 through November 7, 1993 (59 days); December 7, 1993 through January 23, 1994 (49 days); January 26th, 29th, and 30th (3 days); and February 1 through February 9, 1994 (9 days) were all properly excludable. The total excludable days resulting from the continuance of the depositions was 120 days. Schlei was, therefore, brought to trial within 59 includable days. Thus, no violation of the Speedy Trial Act occurred.

62

B. *Schlei's Sixth Amendment Right to a Speedy Trial*

Schlei also contends that the delays in the pretrial proceedings violated his Sixth Amendment right to a speedy trial. Although compliance with the Speedy Trial Act does not bar Sixth Amendment speedy trial claims, "it will be an unusual case in which time limits of the Speedy Trial Act have been met but the [S]ixth [A]mendment right to a speedy trial has been violated." *United States v. Saintil,* 705 F.2d 415, 418 (11th Cir.) (citation omitted), *cert. denied,* 464 U.S. 855, 104 S.Ct. 171, 78 L.Ed.2d 155 (1983). The district court's denial of Schlei's motion to dismiss based upon the Sixth Amendment right to a speedy trial is reviewed *de novo. United States v. Beamon,* 992 F.2d 1009, 1012 (9th Cir.1993). We review the district court's factual findings for clear error. *Id.*

In evaluating whether the constitutional guarantee to a speedy trial had been violated, this court must consider (1) the length of the delay, (2) the reason for the delay, (3) whether and when the defendant asserted the right to a speedy trial, and (4) whether defendant has suffered actual prejudice as a result of the delay. *Barker v. Wingo,* 407 U.S. 514, 530, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101 (1972). These factors must be considered together—no single factor is sufficient to find a deprivation of the defendant's Sixth Amendment right. *Id.* at 533, 92 S.Ct. at 2193. If each of the first three factors weigh heavily in favor of the defendant, however, the defendant is not required to demonstrate actual prejudice. *United States v. Davenport,* 935 F.2d 1223, 1239 (11th Cir.1991).

1. *Length of the Delay*

The length of the delay must be "presumptively prejudicial" to trigger an inquiry into the other three factors. *Ringstaff v. Howard,* 885 F.2d 1542, 1543 (11th Cir.1989), *cert. denied,* 496 U.S. 927, 110 S.Ct. 2622, 110 L.Ed.2d 643 (1990). A delay is considered presumptively prejudicial as it approaches one year. *United States v. Davenport,* 935 F.2d 1223, 1239 (11th Cir.1991).

In this case, more than two years elapsed between Schlei's indictment on October 8, 1992, and the commencement of trial on October 4, 1994.  The Government concedes that this period of time is sufficient to merit an inquiry into the three remaining *Barker* factors.

2. *Reason for the Delay*

Different reasons for delay are accorded different weight in the *Barker* analysis.  407 U.S. at 531, 92 S.Ct. at 2192.  Government actions which are tangential, frivolous, dilatory, or taken in bad faith weigh heavily in favor of a finding that a speedy trial violation occurred.  *United States v. Loud Hawk,* 474 U.S. 302, 315-17, 106 S.Ct. 648, 656-57, 88 L.Ed.2d 640 (1986).  Conversely, delays that occur for valid reasons, such as overcrowded courts or strongly contested interlocutory appeals, will not be accorded heavy weight against the Government.  *Id.*

This court has held that where the delay was caused by "numerous pretrial motions;  the illness of an essential government witness;  [defendant's] substitution of counsel;  and scheduling conflicts resulting in the unavailability of certain defense counsel," there was no violation of the Sixth Amendment.  *Twitty,* 107 F.3d at 1490.  In addition, even where the Government was responsible for the delay, if that delay was "inherent to the government's good faith effort to conduct a complex, joint trial," there was no Sixth Amendment violation in the absence of actual prejudice, because "defendants who are jointly indicted should be tried together, [particularly] in conspiracy cases." *Davenport,* 935 F.2d at 1239-40.

Here, the reason for the delay was in large part twofold.  First, the Government sought to depose witnesses in Japan, who were unavailable for trial.  In June 1993, the district court found that the Government had been diligent in its efforts to obtain the presence of these witnesses at trial.  In connection with these depositions, to safeguard Schlei's Sixth Amendment right to confront witnesses against him, the Government attempted to obtain the guarantee of the government of Japan that they would not arrest Schlei on charges arising from the bond certificates if Schlei entered Japan for the depositions.  When the Government was notified that Japan would not guarantee safe passage, the Government requested a continuance to pursue additional diplomatic channels.  Schlei

did not object to the continuance. From the time the Government moved to take foreign depositions, until the Government ultimately withdrew its request, there were numerous motions and hearings on this issue, which from beginning to end took over a year and a half. The Government, therefore, had valid reasons for the delay.

The second major reason for the delay resulted from well over 100 pretrial motions filed by Schlei and his codefendants. For example, codefendant Hill requested a continuance to depose witnesses in Japan. The district court granted the continuance, and in response, moved the trial date from May 31, 1994 to October 4, 1994, resulting in a five month period of delay.

3. *Defendant's Assertion of the Right to a Speedy Trial*

A defendant's failure to assert his Sixth Amendment right to a speedy trial before the day of trial weighs heavily against the defendant. *Twitty,* 107 F.3d at 1490. Schlei repeatedly asserted his right to a speedy trial, beginning shortly after his arraignment on October 27, 1992. Although factors one and three weigh in favor of Schlei, the second factor, the reasons for the delay, weighs in favor of the Government. Therefore, Schlei must establish actual prejudice.

4. *Prejudice to the Defendant*

Prejudice to the defendant is evaluated in view of the three interests the right to a speedy trial was designed to protect: "(1) to prevent oppressive pretrial incarceration; (2) to minimize anxiety and concern of the accused; and (3) to limit the possibility that the defense will be impaired." *Barker,* 407 U.S. at 532, 92 S.Ct. at 2193. Of these, the most important is the third, "because the inability of a defendant adequately to prepare his case skews the fairness of the entire system. If witnesses die or disappear during a delay, the prejudice is obvious." *Id.* In *Barker,* the Supreme Court found that the prejudice to defendant after a five-year delay was minimal, even where defendant had spent ten months in jail, because there was no harmful impact to the presentation of his case as a result of the error. *Barker,* 407 U.S. at 534, 92 S.Ct. at 2194. In contrast, the Supreme Court held in *Doggett v. U.S.,* 505 U.S. 647, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992), that there was no need for the defendant to demonstrate actual prejudice where there was

65

an 81/2-year delay between indictment and trial due mainly to the Government's negligence. *Id.* at 657, 112 S.Ct. at 2693. The Court based this holding on the fact that "excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify." *Id.* at 655, 112 S.Ct. at 2693.

Schlei argues that he was prejudiced by the following:

Schlei suffered profound prejudice to his life, his livelihood, and his ability to present an effective defense ... Schlei suffered from the restrictions on his liberty and the ongoing anxiety and embarrassment the charges creates in him and his family. His ability to defend suffered by the death of a witness, Kakuei Tanaka.... In addition, Schlei was ruined financially by the pendency of the unresolved charges.

Schlei was free on bail throughout the proceedings. Further, the record reflects that although Schlei surrendered his passport, it was temporarily returned to him several times to allow him to travel overseas.

Schlei has not demonstrated that he was prejudiced because Tanaka died before this case went to trial. Schlei never contacted Tanaka to determine whether his testimony would have been material to his defense. Tanaka died in December 1993, over one year after Schlei was indicted. Further, at Hill's request to depose high-level officials, the Government verified the availability of these witnesses with the government of Japan, and were told "[t]he Ministry of Justice has declined to contact [these witnesses] because, in its opinion, the witnesses alleged relationship to this case is too vague and obviously fraudulent." Although this request was submitted after Tanaka's death, it would seem unlikely that the government of Japan would have granted a request by Schlei to depose Tanaka.

Because Schlei has failed to demonstrate actual prejudice, we hold that he was not deprived of his constitutional right to a speedy trial.

VII

ALLEGED GOVERNMENT MISCONDUCT

A. *Alleged Brady Violation*

66

Schlei claims that he is entitled to a new trial because the prosecution violated *Brady,* by denying him access to exculpatory grand jury testimony until the last week of trial. Schlei argues that

> [a]lthough the prosecution knew for more than two years prior to trial that Han's grand jury testimony was exculpatory, and although Schlei specifically requested its disclosure prior to trial, the prosecution withheld it from the defense until Han actually took the stand during the last week of the trial and the prosecution elected to use it to cross-examine him.

This court reviews an alleged *Brady* violation *de novo. United States v. Mejia,* 82 F.3d 1032, 1036 (11th Cir.), *cert. denied sub nom. Lopez v. United States,* --- U.S. ----, 117 S.Ct. 188, 136 L.Ed.2d 126 (1996).

In *Brady,* the Supreme Court stated that "suppression by the prosecution of evidence favorable to an accused upon request violates due process when the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady,* 373 U.S. at 87, 83 S.Ct. at 1196-97. A defendant who seeks reversal based on an alleged *Brady* violation,

> must show each of the following elements: (1) that the Government possessed evidence favorable to the defendant (including impeachment evidence); (2) that the defendant did not possess the evidence nor could he have obtained it himself with any reasonable diligence; (3) that the prosecution suppressed the favorable evidence; and (4) that had the evidence been revealed to the defense, there is a reasonable probability that the outcome of the proceedings would have been different.

*United States v. Newton,* 44 F.3d 913, 918 (11th Cir.), *cert. denied,* --- U.S. ----, 116 S.Ct. 161, 133 L.Ed.2d 104 (1995).

Schlei asserts that "[t]he withholding of this testimony prevented the defense from using it to cross-examine Hill, Russel, and Weeks, among other witnesses whose testimony intersected with Han's." Schlei has not demonstrated, however, how Han's grand jury testimony would have been effective in cross-examining these witnesses. We are persuaded from our review of the record that prior disclosure of Han's grand jury testimony would not have been helpful to defense counsel in preparing to cross-examine Hill. Han testified that following Hill's arrest, Takahashi revealed to Han and Schlei his September 1991 agreement with Hill to sell financial instruments. Hill had no

67

knowledge of that meeting. Therefore, access to Han's grand jury testimony would not have assisted Schlei's attorney in cross-examining Hill. The evidence shows that Schlei was present at that meeting with Takahashi and Han. Accordingly, Schlei was fully aware of the events to which Han testified.

Weeks and Russel testified that they did not recall whether Han was present at the meeting with Ambassador Mansfield. Han testified that he was present at this meeting. He also testified that Schlei told him that a memorandum of his remarks was typed at the embassy. Because Weeks and Russel could not recall whether Han was present at the meeting, and were not present when Schlei arranged to have his memorandum typed, the Han grand jury transcript would not have assisted in impeaching them. Schlei has failed to demonstrate that there is a reasonable probability that the outcome of the proceedings would have been different had he received a copy of Han's grand jury testimony at an earlier date.

B. *Admissibility of Evidence of a Prior Bad Act Regarding the Embassy Memorandum*

Schlei contends that the district court abused its discretion when it admitted Russel's testimony that Schlei's use of embassy letterhead violated applicable regulations, because the Government did not provide him with reasonable notice as required pursuant to Rule 404(b) of the Federal Rules of Evidence.[17] Schlei also contends that the Government knew or should have known that Russel's testimony regarding the use of the embassy letterhead was false.

_____

[17]Rule 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide *reasonable notice* in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

Fed.R.Evid. 404(b) (emphasis added).

68

"Determinations regarding the admissibility of evidence rest largely with the sound discretion of the trial court and will not be disturbed on appeal absent a clear showing of abuse of discretion." *United States v. Muscatell,* 42 F.3d 627, 630 (11th Cir.), *cert. denied,* --- U.S. ----, 115 S.Ct. 2617, 132 L.Ed.2d 859 (1995). We must decide "whether the evidence in question is actually extrinsic evidence and therefore subject to 404(b) analysis." *Id.* "Evidence of criminal activity other than the charged offense is not extrinsic within the meaning of Rule 404(b) if it is an uncharged offense that arose out of the same transaction or series of transactions as the charged offense." *Id.* "[O]ther transactions connected with the offenses charged have long been used to show a general pattern, the necessary criminal intent, or the guilty knowledge of the defendant." *Id.* at 631 (citation omitted).

Russel's testimony was admissible as intrinsic evidence connected with the offenses charged in the indictment. The evidence with respect to the use of the embassy letterhead was directly related to the scheme to defraud. Hill testified that he used the memorandum typed on embassy letterhead to demonstrate to potential buyers that the United States supported the authenticity of the bond certificates. A rational juror could infer from the preparation and subsequent distribution of this memorandum to the Foundation's sales representatives that Schlei intended it to be used to persuade potential buyers that the authenticity of the forged financial instruments was supported by the government of the United States. Schlei has failed to demonstrate that the district court abused its discretion in admitting Russel's testimony regarding the use of embassy letterhead.

Schlei further claims that the Government knew, or should have known, that Russel's testimony regarding the origin of the embassy memorandum was absolutely false. Schlei argues that the entry in Breer's appointment book indicating a meeting with Schlei, combined with a handwritten notation in the margin of Schlei's copy of the memorandum, seems "to confirm that the letter was typed at the embassy." Schlei has failed to demonstrate that Russel, knew or should have known, that the memorandum was typed by embassy personnel. The fact that Schlei met with Breer and that someone placed a notation on the memorandum, does not support an inference that Russel had any

69

knowledge that an embassy employee typed the memorandum, or that the use of the embassy letterhead was authorized.

VIII

MOTIONS FOR A NEW TRIAL

Schlei challenges the district court's refusal to grant evidentiary hearings on his motion for a new trial in the interest of justice regarding his claim of witness intimidation, and his motion for a new trial based on newly discovered evidence.

"The decision of the trial court not to hold [an evidentiary] hearing is within the trial court's sound discretion, subject to review only for an abuse of that discretion." *United States v. Slocum,* 708 F.2d 587, 600 (11th Cir.1983).

> Rule 33 of the Federal Rules of Criminal Procedure establishes two ways in which a defendant may file a motion for a new trial. First, the defendant can file a motion asking for a new trial "in the interest of justice" if he or she does so within seven days of the verdict or "within such further time as the court may fix *during the 7-day period.* After the seven-day period, however, the defendant can only ask for a new trial based on newly discovered evidence." The defendant has two years in which to ask for a new trial based on newly discovered evidence.

> In reviewing Rule 33 motions, courts apply different standards depending on whether the motion was filed within seven days or after seven days. "[T]he trial court's power with respect to a motion made within [seven] days is much broader than one made later than [seven] days but within two years relying on newly discovered evidence." For motions filed within seven days, a court has very broad discretion in deciding whether there has been a miscarriage of justice.

> After the seven days, a much more stringent standard applies.

*United States v. Hall,* 854 F.2d 1269, 1270-71 (11th Cir.1988) (reversing district court's order for a new trial in the interest of justice where district court deemed motion for a new trial filed after the seven-day limit as a supplement to the original motion for a new trial in the interest of justice filed within the seven-day limit, although the grounds set forth in the earlier-filed motion "were specific and did not relate in any way to newly discovered evidence").

To succeed on a motion for a new trial based on newly discovered evidence, the movant must establish that (1) the evidence was discovered after trial, (2) the failure of the defendant to discover the evidence was not due to a lack of due diligence, (3) the evidence is not merely

70

cumulative or impeaching, (4) the evidence is material to issues before the court, and (5) the evidence is such that a new trial would probably produce a different result. *United States v. Gates,* 10 F.3d 765, 767 (11th Cir.1993), *modified,* 20 F.3d 1550 (11th Cir.1994). "The failure to satisfy any one of these elements is fatal to a motion for a new trial." *United States v. Lee,* 68 F.3d 1267, 1274 (11th Cir.1995).

A. *Motion for a New Trial in the Interest of Justice*

Schlei contends that the district court erred in denying his motion for a new trial in the interest of justice on the question whether the prosecution threatened Han and Senator Arlen Specter to deter them from testifying as defense witnesses without conducting an evidentiary hearing.

This court has held that "[s]ubstantial [government] interference with a defense witness' free and unhampered choice to testify violates due process rights of the defendant. If such a due process violation occurs, the court must reverse without regard to prejudice to the defendants." *United States v. Terzado-Madruga,* 897 F.2d 1099, 1108 (11th Cir.1990) (quoting *Demps v. Wainwright,* 805 F.2d 1426, 1433 (11th Cir.1986)).

On January 25, 1995, within the extended time frame granted by the district court to file a motion for a new trial, Schlei filed a motion for a new trial in the interest of justice, in which he raised the witness intimidation issue and requested an evidentiary hearing. In this motion, Schlei alleged that the Government had threatened Han with a loss of immunity from prosecution if he testified for the defense at trial. He also asserted that the Government threatened to ask Senator Specter inappropriate questions on cross-examination should he testify for the defense. On July 29, 1995, Schlei filed Han's affidavit in support of his motion. Han alleged that AUSA Mark Krum, the prosecutor in this matter, stated that if Han testified for the defense, the immunity agreement would be "nullified." Han also alleged that AUSA Krum stated that he had been opposed to granting Han immunity and that Han "had better not give him any basis to withdraw the immunity because he would not hesitate to do so." Ah Loo subpoenaed Han to appear as a witness at trial. Schlei called

71

Han as a witness for the defense at trial. Schlei did not proffer any evidence relating to the alleged threats against Senator Specter.

The district court did not rule on Schlei's motion for a new trial or for an evidentiary hearing until immediately preceding sentencing on August 4, 1995. Prior to ruling on the motions, the district court heard oral argument regarding whether to grant Schlei's request for an evidentiary hearing in support of his allegation of witness intimidation. The Government "strenuously object[ed] to any continuance." The Government argued (1) that the issue had been fully briefed post-trial; (2) that Schlei's counsel did not diligently attempt to obtain Han's affidavit in a timely manner; (3) that Schlei's witness intimidation claim has no merit; and (4) that Schlei's defense was not prejudiced because Han testified as his witness. Schlei argued that Han's affidavit was newly discovered evidence.

Prior to ruling on the pending motions, the district court noted that "had this Court received this motion for an evidentiary hearing with regard to this matter involving Mr. Han at any time prior to today's date ... we would have been able to have had enough time to fully evaluate whether or not there's merit to this or not." Once the parties completed their argument, the following dialogue occurred:

> THE COURT: ... The witness Han did testify. Is there any dispute about that?
>
> MR. GEORGE: No, Your Honor.
>
> THE COURT: Any dispute about that, Mr. Krum?
>
> MR. KRUM: No, testified for the defense.
>
> THE COURT: Yes. And there was an opportunity for both examination by the Government and by the defense of that witness, correct, both counsel?
>
> MR. KRUM: Yes.

In denying the motion for an evidentiary hearing, the court made the following comment:

> [W]hat this Court has to determine is whether or not, based upon the Court's rulings having been made at the time, whether or not this issue is an issue that needs the attention of this court directly and squarely on the trial had of defendant Schlei.

72

I make a determination that this Court does not have to hold an evidentiary hearing on this issue. What if any further matters need to be dealt with with regard to this, you can make separate application.

The court also denied the motion for a new trial insofar as it was based on witness intimidation. The court reasoned as follows:

Counsel for the Defendant asserts that the Government harassed and intimidated Schlei witnesses in an attempt to keep them from testifying. Witness tampering is a serious matter carrying criminal overtones. The court denies the motion as to this issue as no Court of Law has determined the factual basis nor has determined who was responsible for these alleged incidents.

We cannot determine from the court's explanation of its ruling whether it denied an evidentiary hearing because it concluded that, assuming that Han's allegations are true, they do not constitute witness intimidation. This possible interpretation of the court's comments is undermined by its statement that had the affidavit been filed at an earlier date, the court would have had enough time to determine whether there is any merit to the witness intimidation issue. Because the court did not hold an evidentiary hearing we do not know whether the grant of immunity to Han was conditioned upon his promise not to testify as a defense witness, or the truth of Han's allegation that the prosecutor threatened to void the grant of immunity if Han did so.

The former Fifth Circuit has previously ruled that a plea agreement that provides that it will be void if the accused testifies on behalf of a codefendant violates due process. *United States v. Henricksen,* 564 F.2d 197, 198 (5th Cir.1977). In *Henricksen,* the witness refused to testify on behalf of his codefendants. *Id.*

Here, Schlei alleges that the Government intimidated a defense witness. That witness, however, testified for the defense at trial. We cannot decide today whether the *Henricksen* rule applies to a grant of immunity in a case where the witness testifies for a codefendant, notwithstanding an attempted intimidation, because of the absence of a proper record and findings regarding the alleged conduct of the prosecution or its impact on the witness' testimony.

Where defendants present evidence to the district court that the government intimidated a defense witness a trial court must grant a hearing to determine whether the allegations of

73

intimidation are true. If the witness did not testify, and the allegations of intimidation are true, no prejudice need be shown. *See United States v. Goodwin,* 625 F.2d 693, 703 (5th Cir.1980) ("On this appeal we now face unresolved claims of government intimidation of defense witnesses. If we were not reversing the convictions on other grounds, we would be required to remand to the district court for findings on the validity of these claims. And if proven such violations of due process would require automatic reversal."). Where, as here, the witness testified at trial, we cannot determine whether Schlei was deprived of his right to due process, in the absence of a finding that Han withheld evidence favorable to the defense because of the alleged threat. Under these circumstances, an evidentiary hearing is required to ascertain the impact, if any, of the Government's alleged misconduct on the fairness of the proceedings.

Equally enigmatic is the court's observation that no "Court of Law" had previously determined the factual basis for the claim of "witness tampering." We cannot discern from this record whether the court assumed that, as a matter of law, a claim of witness intimidation cannot be asserted in a motion for a new trial absent a showing that someone had been convicted of "witness tampering."

Relying on *United States v. Holloway,* 778 F.2d 653 (11th Cir.1985), *cert. denied,* 476 U.S. 1158, 106 S.Ct. 2276, 90 L.Ed.2d 719 (1986), the Government argues that "Schlei does not even suggest that he was prejudiced by the prosecutor's conduct." The Government's reliance on *Holloway* is misplaced. This court held in *Holloway* that there was no showing that any witness had been intimidated. *Id.* at 658.

In 1980, this court held in *Goodwin* that

Threats against witnesses are intolerable. Substantial government interference with a defense witness' free and unhampered choice to testify violates due process rights of the defendant. If such a due process violation occurs, the court must reverse without regard to prejudice to the defendants.

*Goodwin,* 625 F.2d at 703. This court reversed on other grounds. *Id.* The court noted that two witnesses did not testify following their alleged intimidation by prison officials. *Id.* at 702. This court instructed the district court that "if witnesses called at the new trial refuse to testify because

74

of alleged threats, the trial judge should take appropriate steps to investigate such claims." *Id.* at 703.

Because the court did not conduct an evidentiary hearing in this matter, we do not know whether the prosecutor's alleged attempt to intimidate Han constitutes a due process violation. We do know that Han testified as a defense witness. We cannot ascertain from this record whether he withheld exculpatory evidence because of the threat to nullify the grant of immunity.

The record is also unclear regarding whether the district court denied Schlei's motion for a new trial because the evidence was not newly discovered, or on the basis that Schlei did not exercise due diligence in investigating this factual issue. Because the record is insufficient to resolve the serious questions raised by Schlei's claim of witness intimidation, we are compelled to vacate the denial of the motion for a new trial on the question of whether Han was intimidated by the prosecutor. The district court should decide if an evidentiary hearing is required to determine whether the alleged intimidation deprived Schlei of his right to due process in view of the fact that Han testified on behalf of the defense. The district court is also requested to make express findings reflecting the factual basis for its rulings.

B. *Motion for a New Trial Based on Newly Discovered Evidence*

Schlei also moved for a new trial based on newly discovered evidence. Schlei informed the court that subsequent to the trial he discovered that Lazar could impeach Hill's testimony. The district court denied his motion on this ground and rejected his request for an evidentiary hearing because Schlei failed to demonstrate that the evidence was unavailable at the time of trial or that it would produce a different result if the case were retried.

In an affidavit submitted in support of Schlei's motion for a new trial, Lazar alleged that

before he pleaded guilty, [Hill] told me repeatedly that neither Han nor Schlei had been aware of his dealings with Takahashi in 1991 and early 1992 that were involved in the Tampa case. He expressly stated to me that Takahashi had told him with great emphasis not to disclose their dealings to Han or Schlei because they did not know about such dealings and he, Takahashi, did not want Han or Schlei to know about them.

Lazar's affidavit corroborates Hill's testimony that Schlei had no knowledge of Hill's involvement in the transaction. Lazar's testimony also would have been cumulative to Han's testimony that Han and Schlei knew nothing about Takahashi's dealings with Hill. The district court did not abuse its discretion in denying the motion for a new trial based on newly discovered evidence because Schlei has failed to demonstrate that a new trial would probably produce a different outcome.

The district court also properly denied Schlei's request for a hearing on his motion for a new trial without an evidentiary hearing. In determining whether a motion for a new trial based on newly discovered evidence was properly denied, we are persuaded that "the acumen gained by a trial judge over the course of the proceedings [makes her] well qualified to rule on the basis of affidavits without a hearing." *United States v. Hamilton,* 559 F.2d 1370, 1373-74 (5th Cir.1977) ("Where evidentiary hearings are ordered, it is because of certain unique situations typically involving allegations of jury tampering, prosecutorial misconduct, or third party confession.").

IX

THE VOIR DIRE EXAMINATION

Schlei maintains that the district court abused its discretion in denying his request for a jury voir dire procedure "that would have provided a meaningful voir dire." He argues that the voir dire examination conducted by the district court failed to inquire whether the prospective jurors were biased because of the pretrial publicity, the fact that two of the defendants were lawyers, and the large face value of the bond certificates and bank notes. Schlei requested that the district court (1) submit a questionnaire to the venire before jury selection, or ask the venire the same questions orally, (2) allow questions probative of bias to be posed to the venirepersons individually, and (3) allow each defense counsel thirty minutes to conduct voir dire.

The conduct of a voir dire examination of a jury is committed to the sound discretion of the district court. *United States v. Hurley,* 746 F.2d 725, 726-27 (11th Cir.1984). "The district court's discretion extends both to the decision whether or not to submit suggested questions to the jury, and

76

to the decision whether to question prospective jurors collectively or individually." *United States v. Delval,* 600 F.2d 1098, 1102 (5th Cir.1979) (citations omitted).

> Even if the district court failed to ask particular voir dire questions that may be warranted in the case, we will find no abuse of discretion if the voir dire questioning as a whole complied with "the essential demands of fairness," that is, if it gave reasonable assurance to the parties that any prejudice of the potential jurors would be discovered.

*United States v. Nash,* 910 F.2d 749, 753 (11th Cir.1990).

Schlei has failed to demonstrate that the voir dire proceedings did not comply with the essential demands of fairness. Schlei's assertions regarding juror bias due to pretrial publicity, the large face amount of the instruments, and the fact that some of the defendants were lawyers, is pure speculation that finds no support in the record. The voir dire examination revealed that only four prospective jurors had been exposed to media publicity regarding this matter. None of them was selected to serve on the jury. Defense counsel were permitted to inquire whether a lawyer who is accused of crime should be judged by a different standard. They also asked the jurors whether they believed that a lawyer should be held criminally responsible for the conduct of his client. The jurors were also thoroughly examined concerning their familiarity with sophisticated financial matters. Defense counsel did not ask any questions regarding the unusually high face value of the financial instruments.

The voir dire examination provided the parties with the reasonable assurance that any juror bias would be detected. Any elicited response that provided even the slightest basis to suspect bias was followed up with specific questions by the court directed at determining the extent of that bias.[18]

---

[18]For example, in response to questions posed by the district court judge, one of the prospective jurors stated "[t]here are lawyers on both sides of this case, of course." Before he could proceed further, the court directed the prospective juror to sidebar where the juror stated: "The expression is the lawyer is an officer of the Court. Is this true only when he's in the courtroom or is it true twenty-four hours a day, three hundred and sixty-five days a year?" The Court explained an attorney's ethical obligation and the balancing with a defendant's constitutional rights where the defendant is also an attorney. Following the court's explanation, the prospective juror stated that he would not have a problem being fair and impartial in view of the court's explanation. Yet, when asked upon further questioning whether because a defendant is a lawyer, there is some affirmative obligation upon that defendant merely because he is a lawyer, the prospective juror responded that he thought "they have an obligation, maybe, since they know the law better ..., to obey it." After some further questioning, the district court,

Schlei has failed "to overcome the general presumption in favor of jury impartiality." *United States v. Tegzes,* 715 F.2d 505, 509 (11th Cir.1983).

Schlei also contends that the district court abused its discretion when it refused to grant the group of five defendants more peremptory challenges than that required for an individual defendant. Schlei did not exercise all of the peremptory challenges available to him. For that reason, Schlei lacks standing to challenge the district court refusal to grant additional peremptory challenges. *See Mills v. GAF Corp.,* 20 F.3d 678, 679 n. 2 (6th Cir.1994) ("One who does not exercise all of his peremptory challenges cannot assign as error the court's refusal to allow a greater number.") (citing *Connecticut Mut. Life Ins. Co. v. Hillmon,* 188 U.S. 208, 212, 23 S.Ct. 294, 295-96, 47 L.Ed. 446 (1903)).

Furthermore, "the fact that the appellant[ ] failed to use all of [his] allotted peremptory challenges indicates the absence of juror prejudice." *United States v. Alvarez,* 755 F.2d 830, 859 (11th Cir.), *cert. denied sub nom. Hernandez v. United States,* 474 U.S. 905, 106 S.Ct. 274, 88 L.Ed.2d 235 (1985). *See also United States v. Gorel,* 622 F.2d 100, 103-04 (5th Cir.1979) ("Indicative of the absence of juror prejudice is the fact that of defendant's ten peremptory challenges, only six were used to strike potential jurors from the case."). The district court did not abuse its discretion when it denied Schlei's objection to the voir dire examination and the denial of his request for additional peremptory challenges.

X

THE SENTENCING DECISION

Schlei asserts that the district court erred in calculating his sentence based upon an intended loss of more than eighty million dollars, pursuant to United States Sentencing Guidelines ("USSG") § 2F1.1(b)(1)(S). This determination increased Schlei's base offense levels by eighteen levels. Schlei contends that section 2F1.1 does not allow an adjustment for loss in a government sting operation because no actual loss is incurred. Alternatively, Schlei maintains that it was not

excused the juror for cause over the objection of the Government.

78

reasonably foreseeable that a loss in excess of eighty million dollars would be incurred. We review the district court's finding as to the amount of loss for clear error. *United States v. Toussaint,* 84 F.3d 1406, 1407 (11th Cir.1996).

Section 2F1.1(b)(1) provides that "[i]f the loss exceeded $2,000," the base offense level should be increased based upon the amount of loss, *e.g.,* if the loss was more than eighty million dollars, add eighteen to the base offense level. USSG § 2F1.1(b)(1)(S). "[I]f an intended loss that the defendant was attempting to inflict can be determined, this figure will be used if it is greater than the actual loss. For example, if the fraud consisted of selling or *attempting* to sell $40,000 in worthless securities, or representing that a forged check for $40,000 was genuine, the loss would be $40,000." USSG § 2F1.1 comment n. 7 (emphasis added).

> Nowhere does the commentary require or even suggest that some actual loss must occur before any intended loss may be considered.... It strikes us as improper to reward a defendant with a lesser punishment because of the fortuity that he was caught before he was able to cause the victim to suffer [actual] loss. The fact that no loss occurred is immaterial to the inquiry of whether [defendant] intended to [inflict an actual loss]; it is this intent, whether or not brought to fruition, that the enhancement is meant to address.... Our precedent also dictates this conclusion.

*Toussaint,* 84 F.3d at 1407-08 (citing *United States v. Menichino,* 989 F.2d 438 (11th Cir.1993)).

Schlei urges us to adopt the law of the Tenth Circuit, which holds that the intended loss in cases of government sting operations is zero. *See United States v. Sneed,* 34 F.3d 1570, 1584 (10th Cir.1994) ("[W]e agree that the intended loss [in a government sting operation] is zero."); *United States v. Galbraith,* 20 F.3d 1054, 1059 (10th Cir.) ("Because this was an undercover sting operation ..., defendant could not have occasioned any loss even if the scheme had been completed. We conclude the intended or probable loss was zero."), *cert. denied,* 513 U.S. 889, 115 S.Ct. 233, 130 L.Ed.2d 157 (1994). This interpretation of an intended loss is inconsistent with our caselaw, as well as that of other circuits. *See, e.g., United States v. Robinson,* 94 F.3d 1325, 1329 (9th Cir.1996) ("There is no reason why defendants caught as a result of a sting operation should be treated any differently than defendants caught participating in an ongoing fraud. As in general fraud cases, "[s]imply because the government's crime prevention efforts prove successful ... does not mean that

the "intended loss" is zero.' ") (quotation omitted); *United States v. Coffman,* 94 F.3d 330, 337 (7th Cir.1996) ("[F]rauds that have no chance of succeeding are nevertheless punishable, and it would be ... contrary to the language of the guidelines, to treat all such frauds the same, as frauds involving an intended loss of zero, even if the magnitude of the intended loss differed vastly."), *cert. denied,* --- U.S. ----, 117 S.Ct. 1426, 137 L.Ed.2d 535 (1997).

The commentary to the guidelines clearly explains that a permissible basis for enhancement is the loss that the defendant intended to inflict. Consistent with the law of this circuit, the fact that the fraud occurs in connection with a sting operation does not affect the evidence of defendant's intent to defraud others. The bond certificates had face values ranging from one hundred million dollars to five billion dollars. The bank notes had a face value of five hundred million dollars. The district court did not clearly err in calculating the amount of the foreseeable intended loss as eighty million dollars.

XI

CONCLUSION

Because of the complexity of the issues in this matter we deem it appropriate to summarize our views. The record reveals sufficient facts to persuade a rational juror beyond a reasonable doubt that Schlei entered into a conspiracy in 1985 with Takahashi and others to sell forged bank notes. That conspiracy was not abandoned prior to the arrest of his coconspirators on January 18, 1992. Schlei did not withdraw from the conspiracy prior to that date. The evidence is also sufficient to support an inference that Schlei knew that these financial instruments were forged. The falsity of the coconspirators' representations regarding the authenticity of the financial instruments was not susceptible to verification by a reasonable purchaser because the alleged secret fund was purportedly amassed in a foreign country approximately fifty years ago by persons who are no longer alive. The fact that potential purchasers were truthfully told that Japanese officials would deny that the bond certificates and bank notes were genuine does not affect the materiality of the false representation that the financial instruments were valid because they had been issued by the Government of Japan.

80

Accordingly, we reject Schlei's argument that we must reverse the conviction because the evidence of fraudulent intent was insufficient to support the verdict.

We are also persuaded that the evidence was sufficient to persuade a rational juror beyond a reasonable doubt that Schlei was guilty as a coconspirator of a scheme to defraud regarding the offer for sale of a counterfeit bond instrument on January 18, 1992 in Tampa, Florida, as alleged in Count Ten of the indictment. The fact that Schlei may not have had knowledge of the Tampa transaction is not relevant because it was a foreseeable act conducted by Takahashi and others in furtherance of the conspiracy to sell the bank notes. As noted above, Schlei did not withdraw from that conspiracy nor did he notify any law enforcement officer of his involvement in a plan to sell forged bank notes.

We are compelled, however, to vacate the conviction of Schlei in Count Ten of the indictment, however, because it also included allegations of a separate securities fraud transaction which occurred in Minot, North Dakota in 1988. The inclusion of two discrete crimes in the same count violated the principle that securities fraud transactions must be set forth in separate counts. Because of this error, we cannot tell whether each juror was convinced beyond a reasonable doubt that Schlei was guilty of the scheme to defraud Agent Fox and Agent Sankey. The Middle District of Florida was not the proper venue for a securities fraud transaction that occurred in Minot, North Dakota. Because it is possible that some of the jurors voted to convict Schlei based upon Olson's conduct in Minot, North Dakota, rather than the January 18, 1992 Tampa transaction, we conclude that the district court abused its discretion in denying Schlei's motion to strike the Olson transaction from Count Ten of the indictment.

The present record also does not support the denial of an evidentiary hearing on Schlei's claim that the prosecutor's threat to nullify Han's grant of immunity was a violation of due process. While we recognize that the witness testified, because no evidentiary hearing was held, we cannot determine from the record whether the witness may have withheld evidence that was favorable to Schlei. For that reason, we vacate the judgment of conviction on all counts with directions that the

81

district court determine whether the prosecutor made the statements attributed to him in Han's affidavit, and if so, whether this conduct affected Han's testimony at trial. The district court is also requested to make express findings in support of its ruling on this issue. If the court determines that the alleged intimidation did not occur, or that, notwithstanding the threat, no prejudice resulted, it may re-enter its judgment of conviction as to Schlei on Count One.[19] If the district court concludes, however, that Han's allegations of intimidation are true, and that the alleged threat caused him to withhold exculpatory evidence, it should determine whether a new trial should be granted.

We affirm the district court on all the remaining issues raised by Schlei.

AFFIRMED IN PART, VACATED IN PART WITH DIRECTIONS.

---

[19]As explained above, the judgment on Count Ten must be vacated because the pleading of separate crimes in the same count may have prejudiced Schlei's right to a proper venue and a unanimous verdict on the precise conduct that caused the jury to find Schlei guilty.